**PENNSYLVANIA PROTECT OUR WATER AND ENVIRONMENTAL RESOURCES, INC., et al., Plaintiffs,**

v.

**The APPALACHIAN REGIONAL COMMISSION, et al., Defendants.**

Civ. A. No. 82–0258.

United States District Court,
M.D. Pennsylvania.

Sept. 20, 1982.

Carl Woodward, III, Sweeney, Bozonelis, Staehle & Woodward, Chatham, N.J., for plaintiffs.

Robert L. McCloskey, Gen. Counsel, Appalachian Regional Commission, Washington, D.C., for Appalachian Regional Commission.

Ronald H. Skubecz, Deputy Atty. Gen., Harrisburg, Pa., for Smith, Thornburgh, Larson, Pa. Gen. State Authority.

David Shipman, Asst. U.S. Atty., Harrisburg, Pa., Frank Locke, Regional Counsel, Region 3 FHWA, Baltimore, Md., for federal defendants.

Hershel J. Richman, Philadelphia, Pa., for Montage, Inc. & Scranton Lackawanna Industrial Building Co.

James J. Ligi, Sol. of the County of Lackawanna, Scranton, Pa., for Lackawanna County Board of Commissions and Charles Lugar.

## MEMORANDUM

RAMBO, District Judge.

In this action plaintiffs seek, *inter alia*, preliminary and permanent injunctive relief against the continued development, allocation of federal funds and construction of an access road to service components of the Montage Project located in Scranton and Moosic, Pennsylvania pending preparation, circulation and public review of a Final Environmental Impact Statement (FEIS) which fully complies with the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.*, (1976) and its implementing regulations. Plaintiffs allege that the FEIS filed in support of the access road, for which federal funds have been approved, is inadequate on a number of grounds.

Extensive briefs have been filed on numerous motions pending before the court. The court held two days of hearings on plaintiffs' motion for preliminary relief as well as the case on the merits. For the reasons which follow the court will grant plaintiffs' requests for injunctive relief which shall last only until the FEIS gives appropriate treatment to an alternative route alignment proposal which was suggested during public hearings on the draft EIS.

## I. Factual Background

Plaintiffs in this action include Protect Our Water and Environmental Resources, Inc. (POWER); James Golden, Jr.; Mary Allen and the Sierra Club. The Borough of Moosic, Pennsylvania was also a party plaintiff but filed a voluntary dismissal which was approved by the court on September 7, 1982. Defendants include the Appalachian Regional Commission (ARC); Al Smith and Richard Thornburgh, Co-Chairmen of the ARC; Drew Lewis, Secretary of the U.S. Department of Transportation; Ray Barnhart, Jr., Administrator of the Federal Highway Administration (FHWA); FHWA; George T. Turner, Jr., Regional Administrator of the FHWA Re-

gion Three; (these last four named defendants will be referred to as the federal defendants); Thomas D. Larson, Secretary of the Pennsylvania Department of Transportation (PennDot); Montage, Inc.; Lackawanna County Board of Commissioners; Charles Lugar, Chairman, Board of Commissioners of Lackawanna County; Scranton Lackawanna Industrial Building Co. (SLIBCO) (these last four named defendants will be referred to as Montage, Inc., et al.); Pennsylvania General Services Administration. (By order dated September 13, 1982 the Pennsylvania General State Authority was substituted as the proper party defendant in place of the Pennsylvania General Services Administration.)

This action arises from a proposal prepared by Montage, Inc. to develop the Montage Project in Lackawanna County, Pennsylvania. Montage, Inc. is a cooperative venture sponsored by the Lackawanna County Commissioners, the Scranton Central Labor Union (AFL–CIO) and its Building Trades Council and the Greater Scranton Chamber of Commerce. The latter chamber has worked through its industrial development organizations, the Lackawanna Industrial Fund Enterprises (LIFE) and (SLIBCO) (FEIS Vol. I, p. 4). The Montage project includes construction of a multi-season recreation area, civic arena, motor inn complex and access road. The access road will provide access to the multi-season recreation area and civic arena from the Davis Street Interchange of Interstate 81. The motor inn will have direct access from Davis Street (FEIS Vol. I, p. 3). The Montage Project is situated on a 534 acre tract of land 425 acres of which was originally owned by the Pennsylvania Gas and Water Company (PG & W) (FEIS Vol. I, pp. 1, 2, 6).

In February 1977 the Lackawanna County Commissioners filed an application with the Appalachian Regional Commission (hereafter ARC) for a grant of federal funds to construct a 2.1 mile, two lane controlled access road [1] (FEIS Vol. I, p. 6).

---

**1.** Under the Appalachian Development Highway System, 40 U.S.C.App. § 201(a) and (b), Con-

The access road right of way comprising 140 feet will be owned and maintained by Lackawanna County to create a buffer zone to control development (FEIS Vol. I, pp. 7, 11). The design and construction of the road would be administered by Penn-Dot. In May 1978 the ARC approved funding of the Montage access road with two preconditions.[2] The ARC forwarded the application to the FHWA. (Administrative Record, hereafter AR, doc'ts. dated May 22, 1978 and May 24, 1978).

The FHWA administers the ARC highway program pursuant to 40 U.S.C. § 201(a) and 49 C.F.R. § 1.48(j). The FHWA determined that an Environmental Impact Statement (EIS) was required prior to construction of the road (AR doc't. dated August 10, 1979). A Draft Environmental Impact Statement (DEIS) was approved for release by FHWA on August 7, 1980 (AR doc't. dated August 8, 1980). Public hearings were held on the DEIS on October 7 and 8, 1980 (AR doc'ts. dated August 8, 1980 and Dec. 10, 1980). The FEIS was signed on July 27, 1981 by the FHWA Administrator for Region 3 subject to the condition that FHWA and PennDot work closely with the Pennsylvania Game Commission to develop a program of measures to mitigate anticipated impacts of the Montage development on wildlife values (FEIS Vol. I Cover Sheet). The FEIS was published in the Federal Register, notice to the public of the FEIS's availability occurred and following expiration of the public availability period, the Regional Director of FHWA signed the Record of Decision (AR

doc'ts. dated Aug. 17, Aug. 28, Oct. 5, 1981 respectively).

On May 12, 1982 ARC determined that the two preconditions set for release of federal funds for construction of the road had been met (AR doc't. dated May 20, 1982).[3] On May 20, 1982, FHWA gave authorization for construction as requested by PennDot (AR doc't. dated May 20, 1982). Bids were invited on May 28, 1982 and bid opening occurred on June 24, 1982.

On August 10, 1982 the FHWA Division Administrator signed a Reevaluation of FEIS/Wetland Finding for the Montage Project (AR doc't. dated August 11, 1982). In the reevaluation the FHWA re-examined the FEIS in light of new information on wetlands to determine if a supplemental EIS needed to be filed. The FHWA concluded that no supplemental EIS was necessary.

II. Procedural Background

Plaintiffs initiated this action by filing a verified complaint on March 2, 1982. The complaint set out five causes of action: violation of NEPA, 42 U.S.C. § 4321 *et seq.* and its implementing regulations, including 23 C.F.R. § 771 *et seq.*, 40 C.F.R. 1500 *et seq.*, and DOT Order 5610.1C; violation of § 404 of the Clean Water Act, 33 U.S.C. § 1344; violation of Executive Order 11990, 42 Fed.Reg. 26961 (1977); violation of Article I Section 27 of the Pennsylvania Constitution; violation of Borough of Moosic, Pennsylvania zoning and subdivision ordinances. The complaint sought preliminary and permanent injunctive relief on all counts.

gress authorized the ARC to designate to the Secretary of Transportation local access roads to be constructed with federal assistance which would serve the Appalachian region in order to provide a highway system which in conjunction with the Interstate System and other Federal aid highways in the Appalachian region, would open up area(s) with developmental potential where commerce and communication have been inhibited by lack of adequate access.

**2.** The two preconditions included: (1) Lackawanna County had to secure a firm deed from Pennsylvania Gas and Water Company for the 400 acre plus tract of land upon which the

recreational site would be located. (2) Lackawanna County had to make a firm commitment as to the method to be used to finance the recreational complex on the 400 acre plus site.

**3.** As previously mentioned, one of the preconditions required SLIBCO to secure a firm deed from PG & W for the recreation site. After protracted administrative hearings before the Public Utility Commission, PG & W received PUC approval to sell 425 acres of land to SLIBCO for the multi-season recreation site. The sale occurred on October 23, 1980. FEIS Vol. I, p. 6.

Motions to dismiss were filed by the following defendants: Montage, Inc., et al., Commonwealth of Pennsylvania on behalf of Governor Thornburgh and Thomas Larson and Pennsylvania General State Authority, ARC, and United States Attorney on behalf of Al Smith.

Plaintiffs then moved for a preliminary injunction on all counts (although plaintiffs' supporting brief only addressed NEPA, Executive Order 11990 and the Clean Water Act). Prior to a hearing on plaintiffs' motion, the following defendants filed motions for summary judgment: Montage, Inc., et al., Commonwealth of Pennsylvania on behalf of Governor Thornburgh, Thomas Larson, Pennsylvania General State Authority; ARC; and the federal defendants.

On July 27, 1982 the court set August 23, 1982 as the hearing date on plaintiffs' motion for a preliminary injunction. On August 4, 1982 the court signed a stipulation signed by all parties whereby the parties agreed *inter alia* that until August 12, 1982 no contract would be awarded and no costs would be incurred relating to construction of the access road. Upon expiration of the stipulation on August 12, 1982 but prior to the hearing on the preliminary injunction, plaintiffs moved for a temporary restraining order. Following a one day hearing on August 17, 1982 the court on the same day denied the motion based upon representations and testimony that no construction would begin prior to the preliminary injunction hearing on August 23, 1982.

The court held hearings on the motion for preliminary and permanent injunctive relief on August 23 and 24, 1982.

### III. Jurisdiction

Plaintiffs base jurisdiction upon 28 U.S.C. § 1331, NEPA, 42 U.S.C. § 4321 *et seq.*, the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and the doctrine of pendent jurisdiction.

### IV. Alleged Violations of NEPA

#### A. Jurisdictional Issues

■ Defendants ARC, Al Smith, and Richard Thornburgh, Federal Co-Chairmen

of the ARC, filed motions to dismiss and motions for summary judgment concerning plaintiffs' NEPA claim on the grounds plaintiffs had failed to state a claim upon which relief could be granted. The motions were based upon two theories: Congress exempted the ARC from NEPA responsibilities; the ARC is not a federal agency and hence has no responsibilities under NEPA.

In support of their argument that neither the ARC nor its Co-Chairmen are subject to the mandates of NEPA, defendants ARC, Smith and Thornburgh rely upon *National Wildlife Federation v. ARC,* No. 78–1913 (D.D.C. filed September 13, 1979), *aff'd.* 677 F.2d 883 (D.C.Cir.1981) and *SMASH, Inc. v. Moreland,* No. C78–1091A (N.D.Ga., filed March 31, 1981). In those cases the district courts ruled that the Appalachian Regional Development Act (ARDA), 40 U.S.C.App. § 1 *et seq.* stands in conflict with NEPA and operates to specifically relieve the ARC and its Co-Chairmen from the obligation to prepare an EIS for activities associated with the Appalachian Development Highway System, 40 U.S.C.App. § 201. *National Wildlife,* No. 78–1913 slip op. at 7–11; *SMASH,* No. C78–1091A, slip op. at 6–8.

This court agrees with the plaintiffs that the D.C. Circuit did not address ARC's exemption from NEPA when the Circuit affirmed the district court decision in *National Wildlife Federation, supra.* Nevertheless, this court agrees with the reasoning of the two district court judges and their conclusion that the FHWA is the federal agency responsible for complying with NEPA requirements, not the ARC or its federal Co-Chairmen. The two district judges reviewed the legislative history of ARDA to reach their conclusion. The Conference Committee's report on the 1967 amendment to § 223 of ARDA, (*See* Pub.L. 90–103, § 118 (1967)) stated:

### PROGRAM IMPLEMENTATION

Section 223 of the 1965 act, as amended by the reported bill, provides that the

Commission's judgment with respect to applying Appalachian Act program criteria, including such matters as the evaluation of growth potential, financial need, and the importance of a program or project and its contribution to the permanent improvement of the area in which it is located and the region, shall be final and not subject to further review by the Federal departments and agencies. *However, no program or project is to be implemented until the applications and plans relating thereto have been determined by the responsible Federal official to be compatible with the provisions and objectives of Federal laws which he administers that are not inconsistent with this act. The technical evaluation of projects and the actual accomplishment of programs and projects continues to be the responsibility of the Federal departments and agencies.* (Emphasis added)

The committee emphasizes that the Commission is not to become an operating agency.

The Commission's operation and experience to date amply demonstrate its ability to make final program and project decisions once the involved Federal agency or agencies has reviewed a proposal. This amendment is necessary to foster and facilitate the smooth and efficient prosecution of the program.

H.R.Rep.No. 548, 90th Cong., 1st Sess. 23–24 (1967), *reprinted in* 1967 U.S.Code Cong. & Ad.News 1640, 1660.

While the emphasized portion of the 1967 conference committee report might be ambiguous, congressional intent was made clear and succinct in the conference report to the 1975 amendments to the ARDA. (*See* Pub.L. No. 94–188, 89 Stat. 1079 (1975)). The conference report stated:

The Congress designed the Appalachian Regional Development Act of 1965 so that in many of the programs under the Act (such as those authorized in sections 202, 204, 205, 207, 211, and 214), the supplemental or special basic grant assistance approved by the Commission is subsequently extended to the grantee through the framework of Federal grant-in-aid programs administered by Federal departments and agencies. Section 116 of the Conference Report provides further clarification that the responsible Federal official shall review such grants only to determine that they are not incompatible with the provisions and objectives of the framework laws which he administers. *In making this modification, however, it is intended that the Federal official administering the framework program through which the Appalachian Act assistance is provided, shall continue to discharge responsibility for assuring that such grants are not incompatible with other Federal laws such as, for example, the National Environmental Policy Act. Thus, the conferees intend, in such cases, that the department or agency responsible for the basic program would make such reviews and assessments as might be required by the National Environmental Policy Act.* (Emphasis added)

S.Rep. No. 94–552, 94th Cong., 1st Sess. 23 (1975); H.R.Rep. No. 94–727, 94th Cong., 1st Sess. 23 (1975) *reprinted in* 1975 U.S. Code Cong. & Ad.News 2157, 2189.

The need for all program grants of ARC to comply with NEPA is not exempted, but ARC is clearly not the entity responsible for the environmental obligations required by NEPA. Therefore, the court concludes plaintiffs have failed to state a claim against defendants ARC, Al Smith and Richard Thornburgh regarding compliance with NEPA.[4]

**B. NEPA Requirements**

NEPA requires all agencies of the Federal Government to include in every recommendation or report on proposals for legislation and other major federal actions sig-

---

**4.** In light of the court's favorable ruling on the congressional exemption issue, the court need not address defendants' contention that the ARC is not a federal agency.

nificantly affecting the quality of the human environment, a detailed statement on

(i) the environmental impact of the proposed action

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented

(iii) alternatives to the proposed action

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C).

NEPA imposes "essentially procedural" duties, *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978) upon administrative agencies considering actions having the potential for affecting the environment. *Township of Lower Alloways Creek v. Public Service Electric and Gas Company*, 687 F.2d 732 (3d Cir.1982). According to the Third Circuit, NEPA is intended to serve two main objectives:

The dominant "thrust" of the Act is to ensure "that environmental concerns [are] integrated into the very process of agency decisionmaking." Additionally, the various procedures mandated by the statute are intended to "inform the public that the agency has considered environmental concerns in its decisionmaking process." (Citations omitted)

*Township of Lower Alloways Creek*, 687 F.2d 732 at 739.

 Furthermore, NEPA requires only that an agency "consider" the environmental consequences of its decisions. Hence, once an EIS is prepared, it does not dictate any substantive outcome; the EIS is intended to make decision makers aware of the potential environmental ramifications of their actions. *Township of Lower Alloways Creek*, 687 F.2d 732 at 739 n. 13.

### C. Scope of Review

 There are two aspects to a court's review of an agency decision subject to the requirements of NEPA. First, a reviewing court must assess the agency's compliance with the duties NEPA places upon it. These duties are essentially procedural. The procedures are designed to insure that the agency takes a hard look at the environmental consequences of its proposed action. *Bosco v. Beck*, 475 F.Supp. 1029, 1033–34 (D.N.J.1979) *aff'd mem.*, 614 F.2d 769 (3d Cir.), *cert. denied*, 449 U.S. 822, 101 S.Ct. 81, 66 L.Ed.2d 24 (1980).

NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural. It is to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decision-making unit of this agency. Administrative decisions should be set aside in this context, as in every other, not simply because the Court is unhappy with the result reached. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978).

*Vermont Yankee* recognizes the impropriety of federal courts engrafting additional procedural or substantive standards onto the statutory requirements for administrative action. *See North Slope Borough v. Andrus*, 642 F.2d 589, 598–99 (D.C.Cir. 1980). This court believes that its review of agency procedures within the requirements of NEPA is governed by the Administrative Procedure Act, 5 U.S.C. § 706(2)(D) which permits a court to set aside agency action found to be "without observance of procedure required by law." *Gloucester County Concerned Citizens v. Goldschmidt*, 533 F.Supp. 1222 (D.N.J. 1982); *Hovson's, Inc. v. Secretary of Interior of U.S.*, 519 F.Supp. 434, 443 n. 2 (D.N.J.1981).

Second, the court makes a substantive review of the agency's action. This substantive review is quite narrow in scope.

The court should only determine if the agency has given good faith consideration to the environmental consequences of its actions. The court should not pass judgment on the balance struck by the agency among competing concerns. *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068 (1st Cir.1980). This second review was set out in *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980) (per curiam):

> once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken."

Another issue raised in this case concerning the court's scope of review of agency compliance with NEPA requirements involves the admissibility of evidence outside of the administrative record. Plaintiffs asserted in their brief opposing defendants' motions for protective orders and motions for summary judgment that the court should hear evidence outside of the administrative record in order to evaluate the alleged inadequacies of the FEIS. In support of their position plaintiffs principally relied on *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368 (2nd Cir.1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978) where the sufficiency of an EIS was under attack. In that case the Second Circuit stated that:

> Allegations that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism under the rug ... raise issues sufficiently important to permit the introduction of new evidence in the district court, including expert testimony with respect to technical matters, both in challenges to the sufficiency of an environ-

mental impact statement and in suits attacking an agency determination that no such statement is necessary. (Footnotes and Citations omitted)

*County of Suffolk,* 562 F.2d at 1384–85.

The Second Circuit, however, limited the probative value of such new evidence. Such evidence was relevant in the case before the court only insofar as it tended to show the agency's research or analysis was clearly inadequate or that the agency failed to set forth opposing views widely shared in the relevant scientific community. 562 F.2d at 1385.

In further support of their position plaintiffs cited two other circuit cases: *Izaak Walton League of America v. Marsh,* 655 F.2d 346 (D.C.Cir.1981), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630; *Citizens for Balanced Environment and Transportation, Inc. v. Volpe,* 650 F.2d 455 (2d Cir.1981).

■ Defendants Montage, Inc., et al. and the federal defendants argued that the court's review was limited to the administrative record and that a de novo review was impermissible. Defendant Montage, Inc., et al. cited among other cases, *Dry Color Manufacturers' Association, Inc. v. Department of Labor,* 486 F.2d 98 (3d Cir.1973) and *Philadelphia Council of Neighborhood Organizations v. Coleman,* 437 F.Supp. 1341 (E.D.Pa.1977), *aff'd mem.,* 578 F.2d 1375 (3d Cir.1978).[5] In *Dry Color* the Third Circuit reviewed Department of Labor emergency temporary standards under the substantial evidence in the record test required by 29 U.S.C. § 655(f). The court found that a report which appeared to constitute substantial evidence for the DOL action was not part of the administrative record. The court stated in a footnote:

> It has long been settled that in reviewing an agency's action and the adequacy of an agency's articulation of its action, including findings of fact and reasoning processes, courts must look to the record

---

**5.** This case was affirmed by judgment order. Judgment orders are not published and have no precedential value. *See* 3d Cir. Internal Operating Procedures, Rules V(F)(2) and VI.

that was considered by the agency and to the factual findings and reasoning of the agency—not to *post hoc* rationalization of counsel or even agency members and not to evidentiary materials that were not considered by the agency. (Citations omitted.)

486 F.2d at 104 n. 8.

In *Philadelphia Housing,* the district court ruled on the adequacy of an FEIS, among other things. The court limited its review to the administrative record although the court indicated that material outside of the record was sometimes admissible and cited *Suffolk County, supra.* The district court concluded, however, that it was unnecessary in the case before it to refer to extra-record evidence to analyze the EIS. 437 F.Supp. at 1366.

This court reviewed the parties' briefs and cases and decided that the Third Circuit had not issued an opinion binding on courts in this circuit conclusively addressing whether plaintiffs challenging the sufficiency of an FEIS could introduce "new evidence" in the district court in order to prove their claim. Therefore, the court allowed plaintiffs to introduce testimony during the hearing on the preliminary injunction and the case on the merits which did not appear in the administrative record. Plaintiffs presented testimony from James Maughan and Elizabeth Levin concerning a report they helped prepare in February 1982 at plaintiffs' request which analyzed deficiencies in the FEIS. The substance of much of their testimony was not part of the administrative record. Plaintiffs also presented testimony from Hugh Palmer of the Pennsylvania Game Commission and Richard McCoy of the United States Fish and Wildlife Service. Major portions of the testimony of the latter two witnesses appear in the administrative record in the form of letters from the Game Commission and United States Fish and Wildlife Service to the FHWA concerning deficiencies in the DEIS and in the form of comments presented at the public hearing on the DEIS. The United States Fish and Wildlife Service also commented upon the FEIS in a letter to the FHWA dated October 5, 1981. Plaintiffs also introduced exhibits some of which did not appear in the administrative record.

With two exceptions defendants only called witnesses who had prepared or reviewed the FEIS in question. (One defense witness, Howard Grossman, had not participated as an FEIS preparer or reviewer. Mr. Grossman briefly testified as to his qualifications as an expert on planning and economic development but was then withdrawn by defense counsel.) The other defense witness who had not participated as an official preparer or reviewer of the FEIS was Jack Sweeney, Montage Project Manager. Portions of his testimony appear in the administrative record. Defendants introduced exhibits some of which did not appear in the administrative record.

Subsequent to the hearing on this case, the Third Circuit issued its opinion in *Township of Lower Alloways Creek,* 687 F.2d 732. Although the *Alloways Creek* opinion does not precisely address whether plaintiffs challenging the sufficiency of an FEIS in a district court may introduce evidence outside of the administrative record, this court concludes that the Third Circuit has given a strong signal that such evidence is inadmissible. In *Alloways Creek* the petitioners contended that the Nuclear Regulatory Commission (NRC) acted unlawfully and unreasonably when it concluded that no significant environmental effects would accompany the storage of additional quantities of spent fuel at the site of the Salem I nuclear reactor and that therefore the preparation of an EIS was unnecessary. In defining the burden the petitioners had to carry in making their claim, the Third Circuit quoted from *Vermont Yankee:*

while it is true that NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that *it alerts the agency to the intervenors'*

*position and contentions.* (Emphasis added)

. . . . .

[A]dministrative proceedings should not be a game or a forum *to engage in unjustified obstructionism* by making cryptic and obscure reference to matters that "ought to be" considered and then, *after failing to do more than bring the matter to the agency's attention,* seeking to have that agency determination vacated on the ground that the agency failed to consider matters "forcefully presented." (Citations omitted) (Emphasis added)

*Lower Alloways Creek,* 687 F.2d 732 at 743.

The Third Circuit rejected the Township of Alloways Creek contention that "[t]o a layman, it seems rather obvious that increasing spent fuel storage of fuel assemblies by a factor of four or five times is a major federal action having potential significant effect on the human environment." *Id.,* at 747. The Court stated:

*Vermont Yankee* would appear to require—not only of intervenors before a federal agency, but also of petitioners before this Court—that at least some effort be made to advance specific allegations tending to indicate that the agency somehow misapplied the law, *misinterpreted the evidence, overlooked certain testimony,* or unreasonably reached its "no significant impact" determination. (Emphasis added)

*Id.,* at 747.

The Court found that the Township lacked any evidentiary underpinning for its declaration that the Salem I expansion was significant. Significantly, the Court pointed out that:

The Township had not contended that the Commission *on the basis of the record before it,* (emphasis in original) arrived at the wrong result with respect to the "significance" question ˙ . . . Nor does the petitioner point to any evidence *in the record* (emphasis added) proffered by it or anyone else demonstrating that significant environmental effects will ac-

company the incremental spent fuel storage increase at Salem I. (Footnote omitted)

*Id.,* at 746.

■ On the basis of the extensive quotation from the Third Circuit's *Alloways Creek* decision, it appears to this court that the Third Circuit would require those plaintiffs challenging the adequacy of an FEIS to base their challenge upon the evidence placed before the agency during development of the administrative record. The Third Circuit's reliance on the quoted portions of *Vermont Yankee* also suggests to this court that plaintiffs wishing to challenge NEPA-related agency actions must at least bring their concerns to the agency's attention in a forceful manner or point out that their concerns were brought to the agency's attention by others.

In conclusion, this court believes that its focus must be limited to the administrative record prepared in connection with the FEIS under attack. The court therefore will disregard the testimony of plaintiffs' and defendants' witnesses to the extent that the substance of their remarks do not appear in the administrative record. Similarly, the court will not rely upon any exhibits which do not appear in the record.

D. The court will now address the alleged deficiencies in the FEIS *seriatum.*

1. Plaintiffs contend that the FEIS totally fails to consider Route 502 as an alternative alignment for the proposed access road. Plaintiffs contend that this alternative route was specifically proposed at the public hearings on the DEIS on October 7th and 8th, 1980.

In order to evaluate plaintiffs' contentions, it is necessary to review the administrative record concerning the Route 502 alternative. On December 11, 1979, Joseph Kukla sent a letter to the FHWA wherein he proposed Route 502 as an alternative to the proposed alternative one access road to serve the Montage project (AR doc't. dated January 30, 1980). On January 30, 1980

the FHWA division administrator sent a letter to Mr. Kukla advising him to present his concerns about the route location at the public hearing on the DEIS in written or oral form (AR doc't. dated January 30, 1980). On December 10, 1980 a memo was sent from PennDot officials to the Montage project manager discussing the transcript of the public hearing on the DEIS held on October 7 and 8, 1980 and the need to respond to comments on the DEIS. The memo refers to written testimony presented by Joseph Kukla which supplements his oral testimony and indicates his comments must be answered (AR doc't. dated December 10, 1980).

By letter dated September 22, 1981 Joseph Kukla wrote to the FHWA objecting to the omission of Route 502 from the FEIS. He also sent a study showing that Route 502 could provide a safer, shorter road with less impact on the environment and with a savings of $1.3 million (AR doc't. dated October 9, 1981). On October 5, 1981 William Sageman of the FHWA prepared a memorandum concerning comment letters on the FEIS received prior to expiration of the public availability period on the FEIS. Mr. Sageman addressed in his memo the letter from Mr. Kukla dated September 22, 1981 in which the latter suggested the Route 502 alternative. Mr. Sageman's memo indicates that "Div. and State review (sic) his testimony at the public hearing and found he *failed* to suggest such an alternative at the proper opportunity ... I feel it is not reasonable alternative to the proposed and approved access road which clearly meets its design intent." This memo has a concurrence signed by V.D. Smeins dated 10/5/81 (AR supplement signed by Fleming, 8/13/82 doc't. dated October 5, 1981).

On October 5, 1981 Mr. Sageman also prepared a handwritten evaluation of Mr. Kukla's alternative. The handwritten evaluation concludes that the alternative does not fulfill the total envisioned area development and forgets the motor lodge and therefore is not considered to be a reasonable alternative. The memo goes on to state that *"Mr. Kukla's biggest mistake was not*

*suggesting this at the public hearing when the public record would then have to demonstrate an analysis of the alternative."* (Emphasis added) (AR supplement signed by Fleming 8/13/82 doc't. dated October 5, 1981).

By letter dated October 9, 1981 the FHWA acting division administrator sent a letter to Mr. Kukla in response to his letter of September 22, 1981. The FHWA letter indicated that the concept proposed by Mr. Kukla in his September letter required utilization of an existing congested interchange, as well as other non-interstate roads through developed areas, in providing the direct connection between the interstate highway and the recreational facilities. According to the FHWA letter, the concept is considered outside the scope of the ARC approval and the approved FEIS (AR doc't. dated October 9, 1981).

By letter dated October 14, 1981, Mr. Kukla wrote to the FHWA regional administrator asking if there was any way to include within the FEIS the alternative he had sent to the FHWA by letter dated September 22, 1981 (AR doc't. dated October 14, 1981). The FHWA responded to Mr. Kukla's above letter by their own letter dated October 30, 1981 (AR doc't. dated October 30, 1981). The FHWA advised Mr. Kukla that his alternative could not be added to the approved FEIS because it was not identified and studied during the FEIS developmental process. The FHWA went on to indicate that the office did consider the alternative and proposed study before approving the record of decision for the FEIS on October 5, 1981. The FHWA concluded that the suggested alternative was not a reasonable alternative for the planned component(s) of the Montage project.

Another letter was sent by the FHWA to Mr. Kukla dated December 22, 1981 (AR doc't. dated December 22, 1981). In that letter the FHWA indicated that the study supplied to them by Mr. Kukla only studied access to the civic arena and recreational complex which is less than planned for by

the Montage project. The FHWA letter indicated that their division office and PennDot staff had reviewed Mr. Kukla's recorded public hearing testimony on the DEIS and had found no evidence that the alternative he supported had been presented at the public hearing. By letter dated January 6, 1982 Mr. Kukla sent a letter to FHWA enclosing a copy of his written testimony presented at the public hearing on the DEIS in which he indicated that page 2 clearly addressed his proposed alternative (AR supplement signed by Fleming 6/14/82 doc't. dated January 6, 1982).

It is clear from the record that FHWA then began checking to determine what had happened to the written testimony that Mr. Kukla apparently presented at the DEIS public hearing. By a memo to files dated August 2, 1982 (AR doc't. dated August 2, 1982) Mr. Sageman indicated that Mr. Kukla's letter of January 6, 1982 was sent to the FHWA division office in Pennsylvania for explanation. The memo indicates that the FHWA division office referred the letter to PennDot. PennDot advised the FHWA division office in late April of 1982 "that *there had been a slip up* with the written material submitted by Mr. Kukla." (Emphasis added) The memo indicates that PennDot had received some material from Mr. Kukla and forwarded the material to the project sponsor for incorporation into the public hearing record. The memo indicates that PennDot could not locate this letter in their previous checks. The material was not included in the public hearing record and therefore was not included in the comments/responses section of the FEIS.

The memo goes on to indicate that the final decision was not without consideration of the suggested alternative since FHWA did review it and found that it was clearly not a reasonable alternative. The memo

parenthetically cites a letter dated 12/22/81.

Plaintiffs contend that the FEIS is deficient for its failure to evaluate the Kukla alternative. Defendants deny the allegation insisting the omission of the alternative in the FEIS was inadvertent but nevertheless the administrative record demonstrates that the alternative was considered and rejected as unreasonable because it did not satisfy the requisite criteria for the project. The parties focused on whether the Kukla alternative was "reasonable" and whether the FEIS had to discuss it as an alternative to the proposed route alignment pursuant to 42 U.S.C. § 4332(2)(C)(iii). While this is an issue, the court also believes that it must address the FEIS's failure to respond to a public comment on the DEIS as required by NEPA implementing regulations discussed below.

 The court concludes that the FEIS fails to comply with the policy of NEPA and its implementing regulations concerning the treatment of public comments received on the DEIS. Council of Environmental Quality (CEQ) implementing regulations and FHWA implementing regulations contemplate a reasonable opportunity for public and official comment on the impact statement. CEQ regulations require the agency preparing a FEIS to assess and consider comments and to respond in one or more of the means listed including explaining why the comments do not warrant further agency response. The CEQ regulations also require all substantive comments received on the DEIS to be attached to the final statement whether or not the comment is thought to merit individual discussion by the agency in the text of the statement. 40 C.F.R. § 1503.4(a)(b) (1981).[6]

Regulations drafted by the FHWA provide that after circulation of the DEIS and

---

**6.** The effective date of the CEQ regulations quoted above is July 30, 1979. (Exceptions not applicable) The court notes that CEQ regulations are not binding on federal agencies that have not specifically adopted them. *See Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421, 424 (5th Cir.1973). The CEQ's interpretation of

NEPA, however, is entitled to substantial deference. *Andrus v. Sierra Club,* 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979). The FHWA has promulgated its own NEPA regulations based in part upon the CEQ regulations. *See* 23 C.F.R. § 771.101 *et seq.*

consideration of comments received, a FEIS shall be prepared by the administration. The FEIS shall identify the preferred alternative, discuss substantive comments received on the DEIS and all reasonable alternatives considered, summarize citizen involvement and include where appropriate a description of the procedures to be followed to assure that all environmental mitigation measures are implemented. 23 C.F.R. § 771.125(a)(1) (1981).

The Department of Transportation has also prepared an Order governing procedures for considering environmental impacts. *See* DOT Order 5610.1C dated September 18, 1979. The Order's provisions governing final statements became effective after July 30, 1981 for those final statements whose drafts were filed with the Environmental Protection Agency (EPA) by July 30, 1979. The provisions apply to the Montage Project FEIS because the DEIS was filed with the EPA on August 11, 1980 (AR doc't. dated September 5, 1980). Under the provisions governing final statements, the Order states: "Every effort should be made to resolve significant issues raised through circulation of the draft EIS ... the final statement shall reflect such issues ..." p. 12 DOT Order 5610.1C. Additionally, the Order states that: "A summary of citizen involvement and any environmental issues raised should be documented in the EIS." p. 18 DOT Order 5610.1C.

■ This unpublished Order may be binding if so intended by the agency. *Doe v. Hampton,* 566 F.2d 265, 281 (D.C.Cir. 1977). Examination of the above provisions persuades this court that the DOT intended the provisions to be mandatory during preparation of final statements.

Courts have addressed the method by which agencies are to respond to comments received from other agencies and from the public and the rationale for the response. In *State of California v. Bergland,* 483 F.Supp. 465, 494 (E.D.CA 1980) the court indicated that while an agency is not required to follow or adopt the comments it receives on an EIS, the relevant questions under NEPA are whether such comments are made available to decision makers, and whether they receive good faith attention from decision makers. The purpose of an EIS is to *disclose* such issues. (Emphasis added) The rationale for responding to public comments was set forth in *Lathan v. Volpe,* 350 F.Supp. 262, 265 (W.D.Wash. 1972):

> The public may also raise environmental questions by way of comment to the draft impact statement. Since the final impact statement must respond to these comments, as well as to the comments of government agencies, environmental harm which might have been overlooked by highway officials may be brought to their attention. For this reason, highway officials must give more than cursory consideration to the suggestions and comments of the public in the preparation of the final impact statement. The proper response to comments which are both relevant and reasonable is to either conduct the research necessary to provide satisfactory answers, or to refer to those places in the impact statement which provide them. If the final statement fails substantially to do so, it will not meet minimum statutory requirements.

■ There appears to be no argument from the cited portions of the administrative record that FHWA viewed Mr. Kukla's comment as substantive, in the words of 3 C.F.R. § 771.125 and relevant and reasonable, in the words of *Lathan v. Volpe.*[7]

---

7. Defendants argue that the alternative was in fact unreasonable and thus need not have been discussed in the alternatives-considered section of the FEIS pursuant to 42 U.S.C. § 4332(2)(C)(iii) or 23 C.F.R. § 777.123(C) and § 777.125(a)(1). The court does not believe the agency's ultimate conclusion as to the unreasonableness of a proposed alternative should govern whether a public comment on a DEIS is defined as substantive. The Kukla comment dealt with a substantive matter, *i.e.* an alternative to the proposed route alignment. This is enough to warrant a response in the FEIS. While defendants do not explicitly argue in their

It is clear that FHWA failed to respond to Mr. Kukla's written comment. Defendants argue, however, that a review of the administrative record discloses that FHWA considered the alternative and thus the inadvertent omission of the comment cannot render the FEIS invalid. In *Grazing Fields Farm*, 626 F.2d at 1073 the court addressed the policy considerations for not allowing use of the administrative record to partially satisfy NEPA's requirement for a detailed statement. That case involved FEIS treatment of an alternative to the proposed route alignment extension. The alternative was proposed three years prior to final approval of the FEIS. The state and federal agencies rejected the alternative following their examination of it through a report by their engineer. A favorable report on the alternative was then submitted to the state and federal agencies about one year before the FEIS was approved. The state agency prepared an addendum addressing the report. The addendum never became part of the FEIS and thus never was circulated to federal agencies nor available for comment. The federal agency responded to the report by a letter to its author. The letter did not respond to the report's criticisms of the proposed alignment.

The *Grazing Fields* defendants maintained that regardless of the insufficiency of the FEIS itself, a review of the entire administrative record indicated that the FHWA had thoroughly considered the proposed alternative in good faith and had thereby complied with the goals of NEPA. Since this is essentially the argument put forth by the defendants in this case, the court agrees entirely with the discussion given to the defense in *Grazing Fields Farm*. In that case, the First Circuit Court of Appeals stated:

We also find persuasive policy reasons for holding that an administrative record cannot save an EIS that otherwise fails to satisfy NEPA. In short, the requirement of a detailed statement is not a

pointless technicality even when the agency has in fact considered environmental factors in good faith; intra-agency consideration lacks the benefits secured by discussion in the EIS. NEPA seeks to achieve substantive environmental improvement by requiring full disclosure of the basis for agency action.... NEPA contemplates that disclosure be made ... to other departments of government and the public at large.

Public oversight of government action that affects the quality of environment has flourished under NEPA .... the logic of the district court's approach (which concluded that the EIS and the administrative record satisfied NEPA requirements) runs counter to the socially useful scrutiny because it would place the burden of combing the administrative record, which is often scattered through the files of numerous federal and state agencies, on interested members of the public. NEPA expressly places the burden of compiling information on the agency so that the public and interested government departments can conveniently monitor and criticize the agency's action.... The district court's approach ... would hinder at least two of the purposes of an environmental impact statement ... it would hamper the flow of information to the public by making more difficult the endeavors of watchdogs who could reasonably be expected to publicize the environmental issues present, and would tend to mute those most likely to identify problems and criticize decisions.

The *Grazing Fields* opinion did make clear that the administrative record could be used by reviewing courts to determine the adequacy of discussion of alternatives in an FEIS:

A court can use the administrative record to set the standard for how much discussion within the EIS a particular alternative merits, but cannot deem the unincorporated record to satisfy that

briefs that the FHWA's conclusion of unreasonableness should determine whether a public

comment is substantive, the argument appears implicit in their treatment of the overall issue.

standard. (Footnote omitted) 626 F.2d at 1074.

This court finds that the above policy decision applies in this case. Since NEPA is to operate as a detailed and full disclosure document, failure of defendants to respond in the FEIS to Mr. Kukla's comment impedes the very purposes sought to be served by NEPA.

The court is aware that relief under NEPA should be remedial rather than punitive and that not all NEPA violations warrant the granting of an injunction. *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017 at 1022. Courts have refused to grant injunctions despite NEPA violations in cases where defendants' good faith efforts to comply with the statute were apparent and most importantly, where defendants' failure to comply with the Act did not result in prejudice. *See Warm Springs* at 1022. This court is unable to conclude that no prejudice has resulted from the FHWA's failure to include within the FEIS the comment made by Mr. Kukla on the DEIS concerning the alternative route proposal as indicated by *Grazing Fields* quoted above.

The federal defendants cited numerous cases in support of their argument that no violation of NEPA had occurred in the FHWA's treatment of the Kukla alternative. The cited cases only dealt with the issue of the FEIS discussion of reasonable alternatives and not with the issue of an FEIS's failure to respond to a public comment on the DEIS. Therefore, to the extent the cases address only the question of discussion of reasonable alternatives, the court finds them inapposite on the public comment issue.

The court will therefore grant plaintiffs' motion for a preliminary injunction but only until defendants have prepared and circulated a supplemental EIS responding to the Kukla alternative.

The parties structured their discussion of the Kukla alternative around the question of whether the FEIS should have discussed the Kukla alternative within the section on reasonable alternatives pursuant to 42 U.S.C. § 4332(2)(C)(iii) and 23 C.F.R. § 771.-125(a)(1).

The court concludes that it is unable to address this issue until FHWA responds to the Kukla alternative and the response has been circulated to the public and other agencies for review and response. Only then will the record be fully developed concerning the alternative. Then the court can evaluate the record in order to assess FHWA's conclusion (presuming the conclusion remains unchanged) that the Kukla proposal fails to fully satisfy the project goals and hence needs no discussion in the FEIS.

2. Plaintiffs allege that the FEIS fails to comply with 42 U.S.C. § 4332(2)(A) in that the team of preparers of the DEIS and FEIS did not include environmental planners or designers.

42 U.S.C. § 4332(2)(A) provides that all agencies of the federal government shall utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making which may have an impact on man's environment. The list of preparers of the FEIS under attack included individuals with the following engineering experience: acoustical, environmental, civil, sanitary, architectural, structural, energy conservation, road design construction, and hydraulic. The list of reviewers of the FEIS included individuals all having specialized training in the environmental area of highway engineering as well as individuals with specialized training in the preparation and review of environmental studies and related documents. Plaintiffs have offered no evidence from the administrative record to substantiate their claim that the team of preparers failed to comply with the mandate of NEPA. The court is satisfied from the review of the FEIS and supporting documentation that the team of preparers adequately performed their job. Additionally, in light of the court's treatment below of the plaintiffs' allegation that the FEIS failed to adequately discuss sec-

ondary growth impacts in areas surrounding the Montage Project, the court feels that the omission of environmental planners did not preclude the team of preparers from adequately complying with NEPA requirements.

3. Plaintiffs also allege in their complaint that the FEIS principally concerns itself with the direct impact of the access road. They allege that it fails to adequately identify and evaluate the environmental impacts of the three components of Montage (ski area, civic arena and hotel complex) and the means to mitigate those impacts. Plaintiffs specifically allege that there has been no preparation of a written mitigation plan despite the qualified approval given to the FEIS by the FHWA Region Three director. The qualified FEIS approval required FHWA and PennDot to work closely with the Pennsylvania Game Commission to develop a program of measures to mitigate anticipated impacts of the Montage development upon wildlife values.

In support of their allegations plaintiffs offered the testimony of Hugh Palmer of the Pennsylvania Game Commission, James Maughan of Metcalf & Eddy, Inc. and Richard McCoy of the United States Fish and Wildlife Service. Mr. Palmer testified that the FEIS was inadequate regarding the discussion of impacts and mitigation measures due to construction and operation of the ski slope and motor lodge. He indicated concern that no alternative plan had yet been developed for the specific location of the civic arena. Mr. Maughan testified that the FEIS was deficient in addressing the impacts and necessary mitigation measures as to all components of the Montage Project. Mr. McCoy testified that the United States Fish and Wildlife Service was concerned about lack of site specific plans for the civic arena, storm water run-off

from all project components, lack of specific plans for ski area construction and operation, lack of identification of soil borrow sites and revegetation plans. The court examined the administrative record and was unable to find any comments from Mr. Palmer or Mr. Maughan on the FEIS. With the exception of remarks about operation of the ski slope, however, the substance of their remarks generally appear in the record as presented by other agencies or individuals.[8] The administrative record does disclose that the United States Fish and Wildlife Service submitted a letter dated October 5, 1981 to the FHWA following the Service's review of the FEIS (AR doc't. dated Oct. 16, 1981). The letter identified three remaining areas of concern to be resolved before the project began. Mr. McCoy indicated he helped prepare the letter. The court will consider those portions of Mr. McCoy's testimony that are reflected in the Oct. 5, 1981 letter and in the administrative record as raised by others and those portions of the testimony of Mr. Palmer and Mr. Maughan which appear in the record as raised by others.

The October 1981 letter from the United States Department of the Interior commenting on the FEIS identified three concerns: the need to include measures within the erosion and sedimentation control plan to neutralize acidic waters from the project area before the acidic waters enter Stafford Meadow Brook; the need to identify the location of borrow sites for topsoil to cover the ski slope and mine dump and to identify revegetation plans for any of the borrow sites; and the suggestion that further consideration be given to alternative three as the proposed access road alignment in order to avoid adverse impacts on wetlands near the proposed site of the civic

---

**8.** The administrative record does disclose that the Pennsylvania Game Commission commented extensively on the DEIS's treatment of wildlife impacts in September of 1980 in a report prepared by Mr. Palmer. Based upon these comments, another report was prepared on wildlife impacts in March 1981 with the assistance of the Commission. Although Vol. I of the FEIS p. 67 indicates that the FEIS was sent to

the Pennsylvania Game Commission, there is no indication in the administrative record that the Commission commented on this March 1981 report which forms part of the FEIS. The court does not find Mr. Palmer's comments about the DEIS relevant regarding the adequacy of the FEIS since major revisions on wildlife impacts were made in the FEIS.

arena and to reduce the number of cuts and fills associated with construction of the access road.

Defendants offered the testimony of Edward Osnick of PennDot and the affidavits and testimony of William Sageman (Federal defendants' Exhibits 11 and 13) and Virgil Smeins (Federal defendants' Exhibit 12) of FHWA. Major portions of the testimony of these three witnesses concerning mitigation efforts appear in the administrative record and hence will be evaluated.

The court has examined the FEIS and the supporting studies to which it refers. The court finds that the FEIS and its studies did in fact examine not only the direct impacts of the access road but also identified and evaluated the direct and secondary environmental impacts of the other Montage components to the extent reasonably possible at this stage of their development. In the report on hydraulic computations (Federal defendants' Exhibit 3) there is a discussion of the predicted effect of storm drainage from the project components into the Stafford Meadow Brook, Rocky Glen Pond and #5 reservoir. Additionally, the report addresses the drainage of the ski slopes and discusses possible mitigation measures for any erosion problems. Finally, in the supplement to the report (Federal defendants' Exhibit 4), erosion and sedimentation control measures are discussed for the access road and the ski slopes.

In the aquatic biology reports (Federal defendants' Exhibits #7 and 8) accompanying the FEIS, six sampling stations throughout the Montage project area were evaluated. The first report concluded that no permanent adverse affects could be anticipated on the sampling stations provided a sound soil erosion and sedimentation control plan approved by the USDA Soil Conservation Service was implemented and properly maintained.

A noise impact study (Federal defendants' Exhibit #5) was also performed for the Montage project. The study evaluated noise impacts at the proposed motel, civic arena and ski lodge sites. The report concluded that noise impacts at the civic arena and ski sites would not exceed the design noise levels at either site regardless of whether the build or no build alternative was chosen. The report concluded that noise impacts at the hotel site would be due mainly from traffic traveling on interstate route 81 and would not be in excess of the *Federal Design Noise* level whether or not the project was built.

The FEIS also included a report which evaluated air quality impacts (Federal defendants' Exhibit #6) for all of the Montage components. The report concluded that the access road was consistent with the state implementation plan for air quality and that carbon monoxide concentrations generated by the access road at the recreation center, civic arena and motel site did not warrant further air quality analysis.

A market study and financial projections report (Federal defendants' Exhibit #1) was also prepared on all aspects of the Montage project. The report concluded that construction of the access road would provide direct local economic benefit. The report further indicated that the Montage Triangle as a whole would beneficially effect the economic picture of the area in many ways including increased employment, increased demand for building materials for the complex, increased annuity-type expenditures and increased real estate taxes as a result of the motor inn.

Finally, an extensive wildlife basis report (Federal defendants' Exhibit #10) was prepared which analyzed the likely impacts of the project components upon wildlife in the area. The report identified specific habitat types and habitat sizes within a 3,300 acre area surrounding the proposed Montage project. The wildlife report outlined a mitigation program covering the protection of critical habitats, mitigation during construction, and revegetation. It specifically recommended that the civic arena be relocated so as to avoid 10 acres of wetlands within the area specified for arena construction. This recommendation was adopted in the FEIS, Vol. II, p. 47.

In light of the qualified approval given to the FEIS by the FHWA, representatives of the Pennsylvania Game Commission, United States Fish and Wildlife Service, Montage, Inc., et al. and PennDot have met to discuss mitigation proposals discussed in the FEIS Vol. I, pp. 41–42 for the Montage project as well as other proposals. The meetings are documented in the administrative record and will be briefly referred to in this opinion. On March 11, 1982 (AR doc't. dated March 11, 1982), representatives of the above organizations met at a coordination meeting held as a condition of the approval of the FEIS. The final design of the proposed access road was reviewed and a number of mitigation measures were discussed. The meeting pertained only to the access road although the meeting notes reflect that *further coordination and mitigation meetings would be held in the future to review the final design plans for the ski slopes, civic arena and the motel.* (Emphasis added)

Further meetings were held by the above representatives on June 2, 1982 (AR signed by Greenawalt, doc't. dated June 2, 1982) where mitigation commitments were made by Montage, Inc. which would be included in the plans and contract proposal for construction of the access road. Another meeting was held on July 22, 1982 (AR signed by Greenawalt, doc't. dated Aug. 4, 1982) whereby the above representatives held a lengthy discussion on numerous mitigation measures pertaining to construction of the access road. Also discussed at this meeting was the fact that final plans have not been developed for the proposed ski area. Meeting notes reflect that preliminary engineering and design plans are proceeding but final proposals will not be developed until the funding program in the form of bonds is completed.

The above lengthy description of the FEIS and its supporting studies in addition to the extensive mitigation meetings that have occurred since the conditional approval of the FEIS indicate to this court that the FEIS does in fact consider the environmental impact not only of the access road but of the additional components of the Montage project. Although more detail could have been provided in the FEIS about the environmental impacts of the project components, the court concludes that sufficient information has been provided in the FEIS to enable a decision maker to make an informed judgment about the proposed project as it presently exists. It is important to remember that the civic arena, recreation area and motor inn are being developed by a non-federal agency (Montage, Inc.). As the administrative record indicates, final design plans have not been completed by Montage, Inc. for these project components and thus extensive site specific information does not appear readily available to the FHWA at this time. The amount of detail required in an FEIS is governed by a reasonableness standard, *Sierra Club v. Froehlke*, 534 F.2d 1289 (8th Cir.1976). It seems unreasonable to this court to require the FHWA to engage in more site specific analysis as to the other project components for which federal funds are not sought, when the non-federal agency, Montage, Inc. will choose much of the timing and implementation of the remaining project components. The court concludes that the FEIS does the best job it can do with its "two sovereignty" arrangement. *See Hovsons*, 519 F.Supp. at 447; *Lake Erie, etc. v. U.S. Army Corps of Engineers*, 526 F.Supp. 1063, 1069 (W.D.Pa.1981).

4. Plaintiffs further allege that the FEIS erroneously states that the project is not located in any wetlands. Plaintiffs contend that the access road directly crosses wetlands and construction of the civic arena will take approximately twelve acres of wetlands. Thus plaintiffs conclude the FEIS fails to identify or discuss the impact on these wetlands or to consider alternatives to avoid these areas.

In support of their contentions plaintiffs offered the testimony of James Maughan of Metcalf & Eddy. He discussed the siting of the civic arena on twelve acres of wetlands. Plaintiffs also called Richard McCoy of the United States Fish and Wild-

life Service. His testimony concerning wetlands is reflected in the administrative record in the form of a letter dated October 5, 1981 to the FHWA regional administrator which he helped prepare. In the letter the Department of the Interior identified three remaining areas of concern following the review of the FEIS. One of the areas concerned the selection of alternative one as the proposed alignment for construction of the access road. The Department emphasized its concern that the selected route would impact "three small forested wetlands." Even though the alignment had been altered slightly to avoid the wetlands, the Department expressed concern that road cuts made uphill from the wetlands could result in sediment and possible acid waters flowing into the wetlands and degrading or permanently reducing their value. Furthermore, the Department expressed concern that the civic arena site would destroy approximately ten acres of forested wetlands. The Department urged that further consideration be given to alternative three rather than alternative one as the proposed alignment for the access road.

In further support of their contentions the plaintiffs alleged in their brief supporting their motion for a preliminary injunction that examination of the site plan in Vol. I of the FEIS, 8–28, figure 11 indicated that the proposed access road alignment crossed two streams both of which involve wetlands. Plaintiffs did not describe the wetlands areas by reference to station markers or streams. Furthermore plaintiffs urged in their brief that the access road construction plans upon which the bids were based show encroachment on wetlands adjacent to the Stark reservoir.

Defendants offered the testimony of Edward Osnick, William Sageman and Virgil Smeins much of whose testimony appears in the record.

The FEIS discussed wetlands in Vols. I and II. Before referring to the FEIS discussion on wetlands, the court believes it would be helpful to indicate how the investigation of wetlands was conducted. This background information is contained in the administrative record supplement (AR doc't. dated August 11, 1982). The August 11 document is a re-evaluation of the FEIS-wetland finding prepared by the FHWA. According to the re-evaluation, following circulation of the DEIS, comments were made concerning impacts to wetlands and wildlife habitats. In coordination with the Pennsylvania Game Commission and following circulation of the DEIS, a consultant was employed to do a detailed wildlife impact assessment study to address the public comments. The wildlife impact basis technical report (Federal defendants' Exhibit # 10) has been previously discussed in this opinion. To prepare the report, a biological field team composed of representatives from the Pennsylvania Game Commission, the preparer of the wildlife basis report and PennDot made field surveys in February 1981 which included walking and mapping the entire project area. The field survey included a 300 foot wide corridor for the recommended access road alignment.

The preparer of the wildlife basis report identified two wetlands that would have been impacted by the proposed road alignment and recommended alignment shifts to avoid those areas. Additionally, the Pennsylvania Game Commission, as a result of their involvement in assisting the preparer of the wildlife basis report, advised Penn-Dot dated March 5, 1981 (AR doc't. dated August 4, 1982) that the proposed alignment for the access road would cross these two wetlands and also suggested a revised alignment to miss them. In accordance with these comments, alignment shifts were made to avoid these identified wetlands.

On the basis of the above information, the FEIS in Vol. I, page 56 stated that: "The project is not located in a Wetlands or Coastal Zone. Two (2) roadway line shifts were made to avoid wet areas. These shifts were made as a result of comment and further study subsequent to the DEIS."

Additionally, the wildlife basis report identified a wetland area that could be im-

pacted by the proposed arena. The wildlife report recommended that the arena be sited so as to avoid this wetland. Therefore, the FEIS in Vol. II, page 47 in response to public concerns about wetlands stated: "The Montage Project will not infringe upon, or have any adverse impact on any wetlands. As a result of further study and comments subsequent to the DEIS, two (2) road alignment shifts were made. The final alignment of the roadway within the existing corridor will totally avoid wetland areas. During the design of the civic arena project, existing wet areas will be avoided and the project will not impact on these areas."

Following approval of the FEIS, meetings were held between the Pennsylvania Game Commission, EPA, U.S. Fish and Wildlife Service, Montage representatives and PennDot. At a meeting on June 22, 1982, the FHWA was advised of the possibility of additional wet areas not previously identified as such. According to the re-evaluation, these additional wet areas were raised at the June 22 meeting by the Pennsylvania Game Commission and the U.S. Fish and Wildlife Service. There was disagreement by those familiar with these areas as to whether or not they were actually wetlands. According to the re-evaluation, on July 2, 1982 representatives of the U.S. Army Corps of Engineers, EPA and U.S. Fish and Wildlife Service reviewed the area in the vicinity of station 213.[9] As a result of their review, they concluded that the area could be classified as a wetland. Therefore, the Corps subsequently defined the wetland area on a map and determined that the total area of this wetland was 6.4 acres. The re-evaluation indicated that approximately 0.4 acres of the marginal wetland would be involved by the proposed project. Alignment shifts to avoid the wetland area were considered but were rejected given the limited ability to make alignment shifts in that area because of eleva-

tion controls and steep terrain. Mitigation measures, however, were developed in cooperation with the EPA, U.S. Fish and Wildlife Service, Pennsylvania Game Commission, PennDot and FHWA to offset impact to this area.

The second area raised at the June 22, 1982 meeting by the Pennsylvania Game Commission and the U.S. Fish and Wildlife Service involved an area in the vicinity of station 244.[10] The area of station 244 was not examined by the Corps, EPA and U.S. Fish and Wildlife Service on July 2, 1982. (The court has presumed that this area too was identified as a wetland area.) The re-evaluation indicates that .07 acres of this subsequently identified wet area would be impacted by the road. The re-evaluation indicates that alignment shifts were considered but were rejected in light of the impracticability of such shifts as discussed more fully below.

Finally, the re-evaluation indicated that the Pennsylvania Game Commission and U.S. Fish and Wildlife Service also expressed concern at the June 22, 1982 meeting that drainage systems shown in the construction plans could result in wetlands adjacent to the project being drained. The re-evaluation indicates that the drainage systems have been reviewed and adjustments made to avoid any possibility of draining adjacent areas.

The FHWA concluded that in view of the minor impact to the newly identified wetlands area, the fact that the minor impact was being adequately mitigated, the fact that there were no significant changes in the proposed action or the affected environment or the anticipated impacts, or the proposed mitigation measures, there was no need to file a supplemental FEIS.

■■■■■■ The court must now decide whether the FEIS adequately addressed the impact of the proposed project on wetlands and discussed alternatives to avoid

---

9. The construction plans for the access road are contained on 25 separate pages. The road appears in segments and is identified by station markings. Station 213 appears on page 13 of

the construction plans. The construction plans are identified as PennDot Exhibit # 1.

10. Station 224 appears on page 16 of PennDot Exhibit # 1.

them. The court must also decide whether the decision of the FHWA not to file a supplemental EIS was reasonable.[11] The court concludes that the FEIS, evaluated in light of the information available to the FHWA at the time the FEIS was prepared, adequately addressed the impact of the project upon wet areas. The court's review of the reasonableness of an agency's consideration of environmental factors is limited by the time at which the decision was made. *Vermont Yankee*, 435 U.S. at 555, 98 S.Ct. at 1217; *City and County of San Francisco v. U.S.*, 615 F.2d 498, 502 (9th Cir.1980). Courts must also apply the rule of reason in determining the adequacy of an EIS lest litigation have no end. *Sierra Club v. Froehlke*, 534 F.2d at 1299. It appears to this court that there was no indication to the FHWA prior to filing of the FEIS of the existence of the two subsequently identified wet areas at stations 213 and 244. A review of the administrative record indicates that the letter from the Pennsylvania Game Commission of March 5, 1981 did not specifically identify these areas. Similarly, a letter from the U.S. Fish and Wildlife Service dated July 13, 1981 (AR doc't. dated July 22, 1981) indicated general concern about the DEIS's failure to adequately discuss wetlands. The letter did not specifically identify wetlands at stations 213 or 244. The Service's letter of October 5, 1981 to FHWA concerning the FEIS also did not specifically identify wet areas at stations 213 or 244. Furthermore, as indicated by the re-evaluation, the fact that experts have disagreed as to the actual wetlands status of the areas further supports the court's conclusion that based upon the information before it, the FHWA reasonably concluded that the project was not located in a wetland.

Furthermore, the court finds that the FEIS sufficiently evaluated alternative road designs to avoid the identified wetlands at the time of preparation of the document. In Vol. I of the FEIS on pages 8 and 9 design alternatives were discussed. The FEIS concluded that alternative one was in fact the most feasible in light of impacts on the environment, construction restrictions and cost effectiveness.

With regard to impact on wetlands in the area of the civic arena, the court is satisfied that the FEIS has identified wetlands that could be impacted should no change in site location be made. The FEIS, in Vol. II, page 47, however, makes a commitment to avoid the wetlands. Although perhaps more information could have been provided, the court is aware that final design plans for the arena have not been made and it is unclear if and when the arena will be built (AR doc't. dated March 11, 1982). Therefore, in light of the information presently available to the FHWA, the commitment not to build on wetland areas appears reasonable and does alert decision makers about the presence of the wetlands. The court is satisfied that the wildlife basis report's discussion of wetlands in the studied area also alerts decision makers to the possible impacts of construction of the civic arena on wetlands given the present available information. *See Lake Erie, etc.*, 526 F.Supp. at 1069–1070. As new information becomes available, the FHWA must reevaluate it (*See* 42 U.S.C. § 4332(2)(A) & (B)) and must continue coordination meetings concerning wildlife impacts. In summary, the court concludes that the FEIS, evaluated in light of the information available to the agency at the time of its preparation, was adequate with regard to the discussion of wetlands, alternatives to avoid them and project impacts upon them.

The court now turns to examination of the FHWA decision not to file a supplemental EIS. A federal agency has a continuing duty to gather and evaluate new information relevant to the environmental impact of its actions. *See* 42 U.S.C. § 4332(2)(A), (B); *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017 (9th Cir.1980) (per

---

**11.** Although plaintiffs' complaint did not specifically attack FHWA's decision not to file a supplemental EIS (since the FHWA made its decision five months after plaintiffs filed their ac- tion), the court views plaintiffs' continuing challenge to the wetlands issue as encompassing the FHWA's decision regarding the filing of a supplemental EIS.

curiam). This section does not mean, however, that a supplemental EIS is required whenever new information becomes available. The FHWA's regulations, 23 C.F.R. § 771.129(b) (1981) state that supplements to a DEIS or FEIS will be necessary when there have been significant changes in the proposed action, the affected environment, the anticipated impacts, or the proposed mitigation measures.

While the regulations are of guidance to the court, they do not in themselves provide a suitable standard for reviewing an agency's decision not to supplement a FEIS in light of new information. This court feels it is appropriate to apply the standard used in reviewing an agency's decision not to file an EIS in the first instance. The standard used by the Third Circuit in evaluating an agency's decision not to file an EIS was set forth in *Lower Alloways Creek*, 687 F.2d 732. In that opinion the Third Circuit assumed without deciding that an agency's determination not to prepare an EIS must be "reasonable under the circumstances." *Id.*, at 742. Reasonableness depends upon such factors as the environmental significance of the new information, the probable accuracy of the information, the degree of care with which the agency considered the information and evaluated its impact, and the degree to which the agency supported its decision not to supplement with a statement of explanation or additional data. *Warm Springs Dam Task Force*, 621 F.2d at 1024.

The re-evaluation indicates that the environmental significance of the new information about the wetlands is minimal. The re-evaluation concluded that the wetland area identified at station 213 had been disturbed by prior coal dumping and was of minimal value since experts disagreed as to whether it was in fact a wetland, it was too small to significantly function in the areas of flood or erosion control and was classified at a very low habitat value by representatives from the Pennsylvania Game Commission, PennDot and the preparer of the wildlife basis report. The re-evaluation indicated that 0.4 acres of the marginal wetland was involved by the access road

and that alignment shifts to avoid it were rejected given the steep terrain and elevation controls established by two railroads which had to be crossed at the same area. The re-evaluation discussed mitigation measures to offset impact to this marginal wetland. The re-evaluation also stated that at a meeting on July 29, 1982 between representatives of PennDot, FHWA, Pennsylvania Game Commission, United States Fish and Wildlife Service and Montage, all parties agreed that the proposed road alignment was in an optimum location regarding wetland impacts, given the proposed mitigation plan and the existing wetlands resources (AR doc't. dated August 4, 1982). There was also general agreement at the meeting that the mitigation plan was adequate to compensate for total wetland involvements of the project.

With regard to the wetland identified at station 244, the re-evaluation indicated that .07 acres would be involved by construction of the access road. The re-evaluation concluded that realignment of the road to totally miss the wet area was not practicable in light of the linear nature of the area and the small acreage involved. Again, the re-evaluation discussed mitigation measures to offset the wetland impacts.

The accuracy of the new information defining the areas at stations 213 and 244 as wetlands is now settled even though there was disagreement between the experts.

The court is satisfied that the FHWA gave careful consideration to the new information concerning the wetlands and concluded that the environmental significance was minimal. It is obvious mitigation measures were discussed and alternatives to avoid the wetland areas were considered. The agency has supported its decision not to supplement the FEIS in sufficient detail and the court concludes that the FHWA's decision was reasonable.

■ 5. Plaintiffs also allege that the FEIS fails to disclose the extent of loss of critical habitat for wildlife or that certain

rare species such as the river otter and bobcat will be entirely driven from the area. Plaintiffs further allege that the FEIS fails to adequately identify or discuss the significant adverse impacts on wildlife. In support of plaintiffs' allegations plaintiffs offered the testimony of Hugh Palmer of the Pennsylvania Game Commission, James Maughan of Metcalf & Eddy, Inc. and Richard McCoy of the United States Fish and Wildlife Service. Their testimony has been summarized above as it relates to wildlife. Mr. Maughan further indicated however, that the wildlife report lacked perspective in disclosing the extent of loss of critical habitat. To the extent that the substance of the testimony of Mr. Palmer and Mr. Maughan does not appear in the administrative record the court will not consider it. As previously indicated, the testimony of Mr. McCoy does appear to some extent in the administrative record in the form of a letter dated October 5, 1981 from the Service to FHWA.

Defendants offered the testimony of Edward Osnick, Virgil Smeins and William Sageman. Major portions of their testimony appear in the FEIS or administrative record.

The court has reviewed the FEIS and the Wildlife Technical Basis Report to which the FEIS refers and has concluded that together they adequately discuss the extent of loss of critical habitat for wildlife. Tables 12 and 13 of the wildlife basis report summarize habitat units lost or gained in each habitat due to the proposed project components as well as describe in acreage the amount of habitat lost due to construction of the project components. The report used a procedure established by the U.S. Fish and Wildlife Service. The court finds that adequate consideration was given to loss of critical habitat. "Methods of quantification are without question matters of judgment and opinion and as such are not subject to court review in the absence of bad faith." *Cape Henry Bird Club v. Laird*, 359 F.Supp. 404, 415 (W.D.Va.), *aff'd.*, 484 F.2d 453 (4th Cir.1973).

With regard to the river otter and bobcat, the wildlife basis report did in fact discuss their probable departure from the area. On page 62, the wildlife report states that development of the ski area will most likely force river otters, if they are present, to move out of the area. It also states that if bobcat are found in the planning segments, they are most likely found in the ski slope segment or in the surrounding areas. The bobcat will likely move out of the area, according to the report, since they do not generally tolerate human activity. The report also states that no federally listed or proposed endangered species under the jurisdiction of the United States Fish and Wildlife Service are known to exist in the project area except for occasional migrating and transient individuals (FEIS Vol. I, p. 97).

Finally, the court finds that the report addresses the significant adverse impacts on wildlife. The report has an entire section entitled "Impact Assessments" in which it analyzes the primary and secondary impacts on wildlife from construction and development of the components of the entire project. The report recommended numerous mitigation measures. Meetings have been held to discuss mitigation proposals. While more detail could have been provided in the FEIS on wildlife impacts and mitigation measures, the court finds that the amount of detail present at this stage of the planning process indicates that the agency has in good faith taken a sufficient look at the environmental consequences of the proposed action. *Save our Sycamore v. Metropolitan Atlanta, Etc.*, 576 F.2d 573 (5th Cir.1978). The court further notes that the Department of Interior letter of October 1981 identified only three areas of remaining concern regarding the FEIS and indicated that the FEIS "adequately addressed most of our Oct. 2, 1980, comments on the draft statement." The areas of concern have been described above. This letter is further indication to the court that although the wildlife basis report and FEIS are not perfect, the FEIS adequately discussed the significant adverse impact of the project upon wildlife in

the area. *See Natural Resources Defense Council, Inc. v. Morton,* 458 F.2d 827, 838 (D.C.Cir.1972).

[23] 6. Plaintiffs also contend that the FEIS fails to adequately identify and discuss the impact of the road and other project components upon the Stafford Meadow Brook and its tributary streams, Spring Brook, Reservoir # 5 which lies at the base of the ski area, Stark Reservoir, Rocky Glen Pond and its tributaries, and upon the aquatic biota in these waters, particularly the native breeding population of brook trout. Plaintiffs also contend that the FEIS contains no data about trout spawning locations and times at the specific locations of access road stream crossings. In support of their allegations, plaintiffs offered the testimony of James Maughan of Metcalf & Eddy, as well as several exhibits. Plaintiffs' Exhibit # 1 was used by Mr. Maughan in order to describe the stream crossings from the proposed access road. The exhibit consisted of a map of the Montage Project contained on the cover of the Pennsylvania Enterprises Institute 1975 Annual Report. This document appears in the administrative record (AR doc't. dated January 3, 1980). Plaintiff's Exhibit # 2 was an aerial photograph taken by PennDot of the Montage Project. This was used by Mr. Maughan in further identifying stream crossings by the proposed access road. This map does not appear in the administrative record. The court will evaluate the testimony of Mr. Maughan and the exhibits presented by plaintiff to the extent they appear in the administrative record. As previously discussed, Mr. Maughan has not presented formal testimony himself in the administrative record and therefore only those portions of his testimony that appear in the record as raised by others will be evaluated.

Mr. Maughan's testimony established three areas of alleged deficiency in the FEIS concerning aquatic biota. He criticized the FEIS's lack of site specific data concerning the impact of the proposed access road on aquatic biota at the stream crossings particularly regarding possible brook trout spawning areas; lack of quantitative analysis of water quality, and failure to fully investigate mitigation proposals. Defendants offered testimony from Edward Osnick of PennDot, and Virgil Smeins of FHWA. Their testimony will be evaluated to the extent it appears in the record.

The court has examined the administrative record and has failed to find site specific criticisms leveled at the FEIS. The court has examined a letter by the Pennsylvania Fish Commission dated January 25, 1979 (FEIS, Vol. I, p. 94) wherein the Fish Commission states that it has no hard data about Stafford Meadow Brook but speculates that from past experience a native brook trout fishery exists in the stream above the abandoned Pennsylvania Gas and Water Company No. 5 dam and possibly downstream of the dam to the man-made divide in the stream. The Commission urged that every precaution be taken to prevent silt, turbidity and excessive run-off from entering the stream and disturbing the fragile aquatic life present in the streams. No specific mention was made of making site specific analysis of the aquatic life and particularly brook trout breeding at each proposed stream crossing.

Similarly, in a letter dated October 5, 1981, from the United States Fish and Wildlife Service (AR doc't. dated October 16, 1981), the agency commented on the FEIS and specifically indicated concern about acidic run-off from the proposed access road and any impact of such run-off on aquatic resources. Again, this letter failed to indicate the need to make site specific analysis of the stream crossings particularly regarding brook trout spawning locations.

Concerns were raised during the public hearings on the DEIS about the water quality of the Stafford Meadow Brook stream and to the extent that these comments coincide with those raised by Mr. Maughan, the court will evaluate them. In Volume II, the FEIS, at pages 26 and 41 responds to questions concerning classification of Stafford Meadow Brook as a cold

water fishery and concerning cuts and fills associated with road-way construction which could expose acid bearing soils and adversely affect Stafford Meadow Brook. The court finds the responses given to these questions are adequate. The court further notes that the aquatic biology reports cited in the FEIS sufficiently evaluate the impacts from construction of the road and other project components upon aquatic biota. Six sampling stations were established along the Stafford Meadow Brook watershed which includes Reservoir # 5 and Rocky Glen Pond. Fish samples were taken at each station during the low sample survey highlighted in aquatic biology report # 2. Trout were found at stations 1, 2 and 3 which were located on the upper portions of the stream. Additionally, in Report No. 1, benthic macroinvertebrates were collected from stations 1, 2, 3 and 4. From the collection of this information the report concluded that the aquatic resources of Stafford Meadow Brook may undergo short-term modifications, however the implementation of an adequate soil erosion and sedimentation control program plus sound construction practices would minimize the possibility of lasting adverse effects. The report further noted that since only a portion of the Stafford Meadow Brook basin is involved in the proposed project, upstream areas would remain undisturbed. This would include the specific locations where trout were collected. Finally, the report concluded that recolonization or recruitment from the upstream reaches of the stream would assure the long-term quality of the Stafford Meadow Brook.

The second area of concern Mr. Maughan identified concerning aquatic biota evolved around the FEIS's alleged failure to discuss in quantitative terms the impact upon water quality and aquatic biota of the use of road de-icing materials including salt and sand. This issue was raised during public hearings on the DEIS and will be addressed below.

Mr. Maughan's final area of concern dealt with the FEIS's alleged inadequate discussion of mitigation measures to ad-

dress the impact of the Montage components upon the area water bodies. This issue was generally raised during public hearings on the DEIS and the court concludes it was adequately addressed in Vol. II, p. 41 in discussion of an erosion and sedimentation control plan. The court also has discussed extensive meetings to discuss mitigation measures that have already occurred between representatives of the United States Fish and Wildlife Service, Pennsylvania Game Commission, PennDot, and Montage, Inc. The court is satisfied that the FEIS took a hard look at the impacts caused by the Montage Project upon aquatic resources.

7. Plaintiffs further allege that the FEIS fails to discuss in quantitative terms the impact upon water quality and aquatic biota of the use of road de-icing materials, including salt and sand, despite requests from the Pennsylvania Game Commission to do so. Mr. Maughan offered testimony on this subject. The substance of portions of Mr. Maughan's testimony appears in the administrative record in the form of issues raised during the hearing on the DEIS on the use of road salts, and oils, etc. during operation and maintenance work on the Montage components (FEIS Vol. II, p. 19). Other portions of Mr. Maughan's testimony do not appear in the record. Specifically, his reference to a report prepared by the Biology Department of the University of New Mexico concerning the effects of ski areas upon biology is not reflected in the record and hence will not be evaluated.

Defendants offered the testimony of Edward Osnick of PennDot and Virgil Smeins of the FHWA. To the extent that their comments are reflected in the administrative record they will be evaluated.

The court is satisfied that Vols. I and II of the FEIS indicate that the FHWA adequately considered the impact of salts and oil upon the water quality of nearby water bodies and their inhabitants. To the extent that quantification is an issue, the court notes that Vol. II of the FEIS at page 19

indicates that the use of de-icing salts will be *minimized* to diminish adverse impacts while insuring a safe roadway during the winter. While more detail could have been provided in the FEIS, this court is satisfied that sufficient consideration was given to the issue in order to withstand attack.

 8. Plaintiffs contend that the analysis of increased storm water run-off and impact is inadequately and inaccurately analyzed in the FEIS. They also allege that the nature and extent of mitigating measures is not discussed. In support of their allegations plaintiffs attached to their brief opposing defendants' motions for summary judgment a report prepared by representatives of Metcalf & Eddy which, among other things, dealt with the FEIS's analysis of increased run-off. This report does not appear in the administrative record and hence will not be evaluated by the court unless its substance appears in the record as presented by others.

The court believes that the FEIS took a hard look at the possibility of storm water run-off generated by the Montage components. An examination of Vols. I and II of the FEIS amply supports the court's conclusion. Vol. I at p. 56 contains a flood hazard evaluation. The evaluation is based upon a hydraulic report and supplement prepared in 1977 and 1980. The reports analyzed increased storm water run-off and general drainage from all components of the Montage Project. The reports concluded that no adverse affects would be caused by construction or operation of any of the components.

The FEIS on page 57 of Vol. I concluded that in order to insure that no adverse impacts occur, the soil erosion and control ponds described in the supplement to the hydraulic report would also double as flow equalization and flood control ponds. Additional coverage was given to this issue in Vol. II of the FEIS at p. 24. In response to public remarks concerning whether the Montage project would cause significant increases in peak flood flows, the FEIS states that hydraulic studies were prepared using two different accepted methods of run-off. The Department of Environmental Resources of Pennsylvania, the Soil Conservation Service and an independent engineer retained by the Pennsylvania Consumer Advocate's office all found the results acceptable. Additionally, the FEIS Vol. II, page 40 indicates that the project must comply with Pennsylvania's new Storm Water Management Act.

The court concludes from the above description that the FEIS gave ample discussion to increased storm water run-off and mitigating measures.

 9. Plaintiffs also contend that the hydrologic analysis in the FEIS fails to quantify projected changes in erosion and resulting sediment buildup in Reservoir # 5. Plaintiffs also contend that the FEIS fails to identify or analyze whether there will be any changes in water quality as a result of this buildup. In support of their allegations plaintiffs offered the testimony of James Maughan of Metcalf & Eddy. As previously indicated, Mr. Maughan did not present testimony at public hearings on the DEIS or submit written comments on the FEIS. To the extent that the substance of his comments does not appear in the administrative record it will not be analyzed.

A review of the record indicates that public comments were raised about significant increases in erosion and sedimentation as a result of construction of the Montage project (Vol. II FEIS, p. 25). The court is satisfied that the FEIS gave adequate consideration to this issue. The response on page 25 of Volume II of the FEIS indicates that strict requirements will be imposed on contractors to minimize erosion and sedimentation during construction. Plans to alleviate the adverse effects from the ski area have already been submitted to and approved by the Soil Conservation Service. The same plan was also submitted to the Pennsylvania Consumer Advocate who engaged an independent environmental engineering firm to review the proposed control methods. The engineering firm accepted the plan. The response further indicates that a final soil erosion and control plan for the access road will be prepared as part of

**1232**

the final design plans and will be submitted to the Soil Conservation Service for approval. The FEIS Vol. I, page 55 indicates that impacts from construction of the multi-season recreational area, civic arena and resort motor inn will have a minimal and short-term impact on water quality. As to Reservoir # 5, a minimal and temporary impact from construction of the recreational area is expected but will be remedied and controlled by implementation of the erosion and sedimentation control plan.

Although the FEIS does not specifically quantify the amount of erosion and soil buildup in Reservoir # 5, the court is satisfied that the issue of erosion and sedimentation has been addressed and has put decision-makers on notice of the possible consequences. To the extent that experts may disagree about the need to quantify the results, this disagreement alone is not enough to invalidate an otherwise sufficient FEIS. *See Life of the Land v. Brinegar,* 485 F.2d 460, 472 (9th Cir.) *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1973).

■ 10. Plaintiffs also assert that the U.S. Army Corps of Engineers has identified Reservoir # 5 as unsafe, yet the FEIS fails to adequately identify or discuss the condition of the dam or whether construction of the ski area or the Montage components will affect the dam in any way. Plaintiffs contend that because the dam is upstream of significant residential and institutional development, evaluation of its structural integrity and adequacy in relation to the project impacts is essential.

In response to plaintiffs' allegation, defendants offered the testimony of Edward Osnick of PennDot and affidavits and testimony from Virgil Smeins, and William Sageman, of the FHWA. To the extent that their affidavits and testimony appear in the administrative record they will be evaluated.

The court is satisfied that the FEIS addressed the impacts of blasting on the reservoir to the extent reasonable under the circumstances. In Vol. II, page 19 the FEIS addresses public comments concerning impacts of blasting on local ground water and reservoir structures. The response indicates that where blasting may be required during construction of the access road, the blasting will be controlled and be kept to a minimum and it is highly improbable that the reservoir structure will be affected. Additionally, at page 40 of Vol. II the FEIS stated that no significant cuts are required for road construction and that areas where blasting will be required are about 4,400 feet from Reservoir # 5.

Although the FEIS does not specifically address blasting necessary for ski slope construction, the court notes that on page 46 of Vol. II of the FEIS a response was given to a question concerning the presence of large boulders on the ski slopes. The response indicated that the recreational area contains about 425 acres. Only 90 to 100 acres are needed for development of the ski slopes. Topography of the area allows for flexibility in the design of the slopes and areas where boulders and cliffs exist will be avoided. The response also indicated that if it is not possible to avoid all such areas, adequate control measures will be implemented during construction.

The court also notes that the DEIS was reviewed by the Army Corps of Engineers. By letter dated September 25, 1980 (FEIS, Vol. II Department of the Army letter) the Army Corps did not indicate any concern about the effects of blasting for construction of any of the Montage projects.

In light of the above information, the court believes that adequate attention was given to the condition of the dam and possible impacts of the foreseeable construction hazards. Plaintiffs have failed to point to anything in the record indicating significant serious impacts that could occur from the blasting for construction of any of the Montage projects. Additionally, the FHWA is under a continuing duty to reevaluate new information as it becomes available relating to the environmental impact of its actions. *See* 42 U.S.C. § 4332(2)(A), (B). The court is confident that based upon the FHWA's prior discussion of impacts of road construction upon

the dam, similar consideration will be given to the dam during the final design and construction stage of the ski slope and other Montage components.

11. Plaintiffs allege that the financial analysis referenced in the FEIS and developed by the accounting consultant for Montage is outdated and unreliable.

The same objection was raised during the public hearing on the DEIS and an adequate response was given in Vol. II of the FEIS, page 27. The court finds no merit to this claim.

■ 12. Plaintiffs further contend that the FEIS totally fails to discuss the physical feasibility of the ski area, nor is any reference made therein to any physical feasibility study. Inasmuch as the road is designed solely to service the Montage Project, including the proposed ski area, plaintiffs allege that failure to include the issue in the FEIS renders the document seriously deficient.

The market study and financial projections prepared for the Montage Project states at page 63: "In general, we feel the site (ski site) has the potential to be developed into one of the largest and finest ski areas in northeastern Pennsylvania. We feel, however, that in order to take full advantage of this potential, a physical feasibility study should be undertaken which deals with weather, soil and other physical factors related to the successful development of the ski area at the site."

The court notes that the FEIS on page 54 of Vol. II states that site specific studies were performed for each of the proposed facility areas. The studies verified the acceptability of each site for the intended purpose of each intended facility. This statement was part of a response given to questions about soil capability. The FEIS Vol. I, pages 15–18 deal with the topography of the recreational area and the climatology of the area. The court concludes that the physical feasibility has been addressed. Furthermore, this factor is really one affecting the substantive decision to pursue the building of the project. The court has concluded that defendants have in good faith considered the environmental consequences of their action. The court's review of the substantive decision is therefore over.

■ 13. Plaintiffs contend that the FEIS fails to analyze and evaluate local zoning and planning laws applicable to the project.

The FEIS at Vol. I, page 62 states that all elements of Montage are in accordance with current Land Use Planning and Zoning regulations of the various municipalities in which Montage is located. Additionally, in the appendix attached to Vol. I of the FEIS are documents from the Scranton Board of Zoning Appeals, Scranton City Planning Commission, and the Lackawanna County Regional Planning Commission, indicating that the project complied with local land use development plans and regulations. No more is required in these circumstances. *See Isle of Hope, etc. v. U.S. Army Corps of Engineers*, 646 F.2d 215, 221–222 (5th Cir.1981).

14. Plaintiffs also allege that the FEIS totally fails to identify, discuss, or analyze the development to be induced by the Montage Project and its impact on environmentally sensitive areas. According to plaintiffs this includes the potential for and likelihood of development of the more than 8,000 acres of PG & W land surrounding the Montage Project.

This issue was discussed in several places in Vols. I and II of the FEIS. In Vol. I, page 62 under Land Use Planning Impacts the FEIS discussed secondary impacts of the Montage Triangle. The FEIS states that no forced growth or increased pressure for development is anticipated. It further states that all elements of the project are in accordance with current land use planning and zoning regulations of the various municipalities in which Montage is located. (As previously discussed, FEIS Vol. I includes zoning approval letters from local municipalities.) The section concludes with the statement that the controlled access character of the access road will be maintained by the county land use controls.

Further discussion of this issue appears in Vol. II of the FEIS. In response to statements that Montage will eventually result in the development of thousands of acres, the FEIS at p. 12 states:

The Montage Access Road will service the components comprising the Montage Triangle, specifically the Motor Inn, Civic Arena and Multi-Season Recreation Area. *Montage, Inc. has no plans to build or develop any other acreage than the just referenced Montage Triangle.* (Emphasis added).

The Pennsylvania Gas and Water Company has testified before Administrative Law Judge Morris Mindlin [concerning PG & W's application to the PUC for approval to convey 400 plus acres to SLIBCO for the recreation site] that it has no present plans to *develop the watershed land adjacent to, or in the immediate vicinity of the Montage Project.* (Emphasis added)

Further statements concerning PG & W involvement in the Montage Project appear in Vol. I, pp. 85 and 86. In a letter dated February 14, 1979 PG & W stated that it is not an active participant in the Montage Project and does not intend to become an active participant but will honor its commitment to donate approximately 400 acres of land to the project in the event it goes forward.

In response to a statement that the project consists of 8,000 acres, the FEIS, Vol. II, p. 45 states that the Market Study (Federal defendants' Exhibit # 1) indicated that the site evaluated consisted of 8,000 acres; the final project area is 534 acres. The FEIS response also forms part of the basis of a statement made in Vol. I, p. one that early discussions of the Montage Project speculated about the inclusion of 8,000 acres. The statement at page one says that subsequent engineering and economic studies have resulted in the definition of the 534 acre Montage Project.

In response to concerns raised about the placement and control of the road access buffer zone, the FEIS, Vol. II, p. 21 states that:

The buffer zone which will extend from the Davis Street exit of I–81 to the parking area of the multi-season recreation area will be 140 feet in width ... There are no plans for any development other than multi-season recreation uses, the civic arena, and motor inn ... Lackawanna County, through its land use planning and zoning controls, working in cooperation with DER (Pennsylvania Department of Environmental Resources), other state agencies and local municipalities will be the mechanism for providing this control.

Vol. I of the FEIS, p. 12 further stated that *no driveways,* crossroads or strip development with access from this road are planned. (Emphasis added)

Plaintiffs contend that this discussion in both volumes of the FEIS is inadequate. They argue that the Montage Project as originally conceived included extensive housing and other activities. They contend that the "no present plans" can change at any time and likely will change once the ski area and access road are built. They argue that the FEIS must address in detail the physical suitability of the land for development, constraints on development, potential for secondary growth and its impact on sensitive areas. In support of their argument plaintiffs offered the testimony of Elizabeth Levin of Metcalf & Eddy. Ms. Levin testified about a report she helped prepare concerning deficiencies in the FEIS particularly regarding secondary development. Neither the report nor her testimony appear in the record. To the extent the substance of her remarks or report do not appear in the record, the court will not consider it.

In further support of their argument, plaintiffs introduced the 1977 application submitted by Lackawanna County to the ARC for funding of the proposed access road (Vol. I FEIS, App. 26). (Plaintiffs' Exhibit # 3.) Plaintiffs point to page one of the application which states:

Montage will be located on approximately 8,000 acres ...

. . . . .

Of the total 8,000 acres available, it is estimated that a maximum of 30 percent will be developed for any purpose.

On that same page, however, and within the same paragraph the application goes on to state. "This *tentative* plan has met with the approval of most of the average citizens as well as with the more concerned environmentalists in the county." Furthermore, on page four the application states that "PG & W currently owns most of the land, using seven reservoirs on the land for water supply purposes." The court has already noted those portions of the FEIS which indicate that PG & W has no plans to develop the surrounding area or to become an active participant in the project.

Plaintiffs also introduced the 1975 Annual Report of Pennsylvania Enterprises, Inc. whose operating utility is PG & W (AR doc't. dated October 2, 1978). The 1975 report includes a map of the Montage Project as conceived at that time (Plaintiffs' Exhibit #1). Plaintiffs also introduced a copy of the Montage Master Plan for 1975 (AR doc't. dated October 2, 1978) which showed proposed housing sites throughout the project area as conceived at that time (Plaintiffs' Exhibit #5). Finally, plaintiffs introduced a letter written by John Sweeney to United States Representative Frank O'Connell dated March 10, 1977 (AR doc't. dated October 2, 1978) (Plaintiffs' Exhibit #6). The Sweeney letter stated in part:

B. Ripple Effect of Development.

Drawing upon the experience of similar projects, it can be anticipated that the completion of the initial complex will stimulate private development almost immediately.

It is conservatively estimated that between ($10,000,000) ten million and ($20,-000,000) twenty million dollars of new construction will be initiated within (5) years.

C. Private Development of Housing.

Planning for private development of over 1,000 acres of various forms of residential structures over a four or five year period would increase local real estate taxes nearly 16%. Annually this would mean approximately $1,300,000 in new revenue. The shelter construction is planned as follows:

| Type of Unit | # of Unit | Total Est. Val. |
| --- | --- | --- |
| Single-family | 500 | $ 22,500,000 |
| Chalet | 200 | 6,000,000 |
| Condominium | 200 | 13,000,000 |
| Total | 900 | $ 41,500,000 |

In support of their argument plaintiffs cited *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774 (9th Cir.1980); *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir.1975); *Rankin v. Coleman*, 394 F.Supp. 647 (E.D.N.C.1975); *Appalachian Mountain Club v. Brinegar*, 394 F.Supp. 105 (D.N.H.1975).

Defendants argue that there are no present plans to develop the 8,000 acres surrounding the proposed site and that plaintiffs' only evidence to the contrary is the existence of a conceptual plan for the area prepared by PG & W in 1975 which has since been abandoned. The defendants also find the instant case distinguishable from plaintiffs' cited cases. The court agrees.

An FEIS must discuss significant secondary impacts of constructing the project as proposed. *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir.1975). The court has reviewed the administrative record to determine the significance of secondary impacts and the extent to which the FEIS should have addressed them (*See Grazing Farms*, 626 F.2d at 1074). According to a conference memo dated September 20, 1978 (AR doc't. dated September 27, 1978) PG & W hired a firm to develop a plan to utilize the 5,000 plus acres of land owned by PG & W. The Montage Master Plan was thus developed for PG & W in 1975 (Plaintiffs' Exhibit #5). The plan called for several thousand housing and condominium sites. Subsequently, the project was scaled down to include only a ski slope and recreation area to be constructed and operated by Lackawanna County; a convention center and motel, both of which would be privately constructed and operated, and an access

road. The memo indicates that Montage, Inc., the Lackawanna County Commissioners and Greater Scranton Chamber of Commerce would sponsor construction of the access road. Significantly, the memo indicates that PG & W and Pennsylvania Enterprises, Inc. had withdrawn any indication of interest in the project beyond donation of the 400 acres already committed to the county for the recreation complex. This is confirmed in the FEIS, as noted above.

By letter dated January 30, 1980 (AR doc't. dated January 30, 1980) the FHWA stated that the 1975 Master Plan had reportedly been abandoned.

■ The FEIS essentially treats the above factual description of future development as too remote and speculative to discuss in detail and emphasizes the existence of continuing opportunities to limit its adverse effects through local land use controls. Given this situation this court feels, as in *Concerned Citizens, Etc. v. Secretary of Transportation,* 641 F.2d 1, 5, 6 (1st Cir.1981), that the FEIS's discussion of secondary growth was minimally acceptable under all the circumstances. *See also Farmland Preservation Association v. Adams,* 491 F.Supp. 601, 610–611 (N.D. Iowa), *aff'd.,* 611 F.2d 233 (8th Cir.1979); *South La. Environmental Council, Inc. v. Sand,* 629 F.2d 1005, 1016 (5th Cir.1980).

Plaintiffs' cases are all distinguishable from the case at bar in terms of the degree to which secondary impacts could be anticipated at the time the FEIS or Negative Declaration was prepared. *Coalition for Canyon Preservation v. Bowers,* 632 F.2d at 774 involved the construction of a 10.8 mile, four-lane segment of a highway into Glacier National Park. The plan, as originally proposed, entailed the expansion of a 26 foot road running through several small rural towns into an 88 foot highway, and the construction of curbs and gutters in the towns themselves; since tourism was a major source of income for the towns and roadside businesses were common, the court concluded that the road was likely to have major effects on the character of the

towns. *City of Davis v. Coleman,* 521 F.2d 661 (9th Cir.1975) concerned the construction of a proposed interchange in a rural area whose purpose, the court, *supra* at 667, determined was "not to meet existing demand for freeway access but to *stimulate and service future industrial development* in the Kidwell area which Solano County and the City of Dixon are *now planning.*" The court, *supra* at 675, concluded that "*the growth-inducing effects* of the Kidwell Interchange project are its *raison d'etre ...*" (Emphasis supplied). The proposed road in *Rankin v. Coleman,* 394 F.Supp. 647 (E.D.N.C.1975) was to be constructed on Bogue Island, a barrier island in the Outer Banks. The EIS stated as one of its goals that "a modern highway can enhance the economic progress of resort and recreational area ... and *[e]xisting and planned* land development ... will benefit from the project." *Id.* at 657 (Emphasis supplied). Finally, the highway proposed in *Appalachian Mountain Club v. Brinegar,* 394 F.Supp. 105 (D.N.H.1975) had as its purpose the completion of a north-south interstate in which the only remaining uncompleted portion would run directly through Franconia Notch State Park.

In all of plaintiffs' cases, increased and foreseeable development was one of the immediate goals of the projects which thus required more detailed FEIS consideration. This differs from the instant case where the only planned development includes the motel, civic arena, and ski area. There is no evidence to support any other conclusion but that secondary growth is too remote and speculative to merit more discussion in the FEIS.

■ At the hearing on plaintiffs' motion for preliminary and injunctive relief, plaintiffs raised two additional issues concerning the FEIS. The first issue dealt with the FEIS's failure to identify the location of the soil borrow sites. The second issue concerned plaintiffs' review of the construction plans for the access road. Plaintiffs contend that contrary to the FEIS, no provision is made in the construc-

tion plans for the installation of sewer and water lines. Plaintiffs offered testimony from Richard McCoy concerning these two issues. To the extent that his testimony is reflected in the administrative record the court will evaluate it. As previously mentioned, the October 5, 1981 letter from the U.S. Fish and Wildlife Service to the FHWA discussed the FEIS's failure to identify the location of borrow sites for topsoil to cover the ski slope and mine dump. (AR supplement signed by Fleming 6/14/82 doc't. dated October 16, 1981). No mention is made in the letter of the review of construction plans for the installation of sewer and water lines.

The FEIS Vol. II, page 42 addresses the location of borrow pits. Additionally, this issue has received discussion during mitigation meetings that have taken place between representatives from PennDot, U.S. Fish and Wildlife Service, the Pennsylvania Game Commission, FHWA and Montage (AR supplement signed by Greenawalt 8/13/82, doc't. dated August 4, 1982). The court is satisfied that these items in the record indicate that the FHWA has given adequate consideration to the location of borrow sites to the extent reasonably possible at this stage of the planning process.

With regard to plaintiffs' review of construction plans concerning the location of sewer and water lines, the FEIS Vol. II, page 14 addresses when sewer and water lines will be constructed. The response indicates that they will be constructed at the time of and as part of the access road construction. There is no indication in the record that this general time frame has been changed. Therefore, the court finds no merit to plaintiffs' contention.

## V. Clean Water Act Claim

▮▮ Plaintiffs allege that defendants violated § 404 of the Clean Water Act 33 U.S.C. § 1344 by failing to submit applications to the United States Army Corps of Engineers for the placement of fill material in certain specified bodies of water and wetlands. Defendants Montage, Inc., et al. dispute plaintiffs' standing to raise this

issue either under § 505 of the Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act), 33 U.S.C. § 1365 or under § 10 of the Administrative Procedure Act, 5 U.S.C. § 702. They also contend that plaintiffs have failed to allege the discharge of dredged or fill material into specified waters.

This court does not believe that the standing issue nor the effluent issue need be addressed since the FEIS and the supplemental administrative record clearly indicate that a § 404 permit is unnecessary and hence the claim lacks merit.

Vol. II of the FEIS contains a letter dated September 25, 1980 from William E. Trieschman, Jr., Chief, Planning Division, Corps of Engineers, to Thomas J. Collins, P.E., Pennsylvania Department of Transportation. The following statements appear in Mr. Trieschman's letter:

> The proposed crossing of the unnamed tributary of Stafford Meadow Brook will require Department of the Army authorization under Section 404 of the Clean Water Act. However, we believe that this work would qualify for authorization by the Nationwide Permit. This is also true for the crossing of the unnamed tributary of Rocky Glen Pond. (mentioned on page 45)

A further letter from the Army Corps of Engineers (dated July 29, 1982) to the Federal Highway Administration addresses this issue:

> Our review of this situation has revealed that the discharge of dredged or fill material into the subject waters of the United States (6.4 acres of wetlands) is permitted under a Department of the Army Nationwide Permit as published in the Federal Register 22 July 1982 (33 C.F.R. 330.4(a)(1)) and prior to that in the 19 July 1977 issue (33 C.F.R. 323.4-2(1)(2)). Therefore, no individual 404 permit is required provided the discharge is accomplished with conditions attached.

(AR doc't. dated July 29, 1982)

It thus appears from the record that the § 404 permit issue has been adequately

reviewed and it has been determined that it would not be required for the proposed project.

## VI. Executive Order 11990 Claim

██ Plaintiffs also allege that there has been a failure to comply with Executive Order 11990 and FHWA implementing regulations.

Plaintiffs rely on § 2(a) of the Executive Order 11990 which provides:

In furtherance of Section 101(b)(3) of the National Environmental Policy Act of 1969 (42 U.S.C. 4331(b)(3)) to improve and coordinate Federal plans, functions, programs and resources to the end that the Nation may attain the widest range of beneficial uses of the environment without degradation and risk to health or safety, each agency, to the extent permitted by law, shall avoid undertaking or providing assistance for new construction located in wetlands unless the head of the agency finds (1) that there is no practicable alternative to such construction, and (2) that the proposed action includes all practicable measures to minimize harm to wetlands which may result from such use.

Plaintiffs claim that the FEIS did not comply with the order because the FEIS claims that no wetlands are impacted by the project when the opposite is true.

Defendants contend that the Order by its terms is inapplicable to this case (See § 1(b) of Order), and that plaintiffs have no private cause of action under Executive Order 11990. Defendants ARC and its Co-Chairmen also contend that the Order is inapplicable to them because ARC is not a federal agency. Once again the court believes that issue of standing and the ARC's status as an agency need not be addressed because even assuming the Order applies to this case, on the record before the court there appears to have been compliance with it.

A re-evaluation of the FEIS regarding wetland findings was made by FHWA (AR doc't. dated August 11, 1982). The wetland areas were designated in detail along with an examination of alternatives to avoid the areas and a discussion of mitigation measures. Louis M. Papet, Division Administrator for FHWA who authored the re-evaluation report, also concluded that the impact on the designated wetlands was minor and was being adequately mitigated and therefore no supplemental EIS was warranted.

Thus a review of the record shows that there was compliance with Executive Order 11990, albeit somewhat late in the proceedings. The Pennsylvania Game Commission, PennDot, United States Army Corps of Engineers, EPA and the United States Fish and Wildlife Service had an opportunity to review and combine their efforts in this re-evaluation.

Plaintiffs have failed to meet their burden of proof with regard to their second and third causes of action.

## VII. Plaintiffs' Pendent State Claims

In Count IV of the complaint, plaintiffs contend that PennDot and its Secretary and the Pennsylvania General State Authority (GSA) (the GSA was substituted for the Pennsylvania General Services Administration as the appropriate party by order dated September 13, 1982) have failed to comply with Article I § 27 of the Pennsylvania Constitution. Plaintiffs allege that PennDot's overall responsibility for the access road and GSA's conveyance of land to Montage[12] have failed to conserve and maintain the environmental rights guaranteed to the people of Pennsylvania.

In Count V of the complaint plaintiffs contend that neither SLIBCO, Montage nor PG & W have made application for zoning or subdivision approval to the Borough of Moosic for the Montage Project or the con-

---

12. Plaintiffs alleged that GSA is the owner of certain state lands in Moosic upon which a portion of the Project is to be located and which will be or may have been conveyed to Montage. Complaint p. 6. The FEIS Vol. I, p. 7 indicates that GSA sold 30.6 acres to Lackawanna County on November 14, 1978 and will be asked to sell 59 more acres to the County for the civic arena at an appropriate time.

veyance of land which conveyance constitutes a subdivision.

Plaintiffs maintain that Counts IV and V are properly before the court on the basis of pendent jurisdiction. Defendants Montage, Inc., et al. and defendants GSA and Larson argue that pendent jurisdiction is the sole basis for this court's potential jurisdiction and that the court should exercise its discretion and decline to hear the state claims.

Defendants GSA and Larson contend that Count IV of the instant action does not fall under the principle enunciated in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) but instead is governed by *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976) and *Wilkes-Barre v. Newspaper Guild*, 504 F.Supp. 54 (M.D.Pa. 1980) reversed on other grounds, 647 F.2d 372, (3d Cir.1981), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295. The latter cases address whether pendent jurisdiction extends to confer jurisdiction over parties as to when no independent basis of federal jurisdiction exists. Plaintiffs contend that regardless of whether GSA and Larson are pendent parties, they are indispensable parties under Fed.R.Civ.P. 19 and hence their joinder is proper irrespective of their characterization as pendent parties. Plaintiffs cite *Federal Deposit Ins. Corp. v. Otero*, 598 F.2d 627 (1st Cir.1979).

 The court questions plaintiffs' pendent party theory [13] but will assume for purposes of argument that the court has the judicial power to hear the claims against GSA and Larson. The court then must determine whether various prudential factors direct the court to exercise its discretion and refuse to hear the fourth and fifth counts. These concerns deal with judicial economy, convenience, fairness to the litigants and considerations of comity.

 Defendants Montage, Inc., et al. and Larson and GSA focus on these prudential considerations and argue against jurisdiction. The court agrees. Defendants argue that trial of the fourth claim involving the Pennsylvania Constitution concerns different statutory standards, governmental policies and types and degrees of proof. They identified the factors the court must address in evaluating the merits of a claim under Article I § 27 of the state constitution. *See Payne v. Kassab*, 11 Pa.Commw. 14, 312 A.2d 86 (1973). One factor includes determining whether defendants have complied with all applicable statutes and regulations relevant to protection of the Commonwealth's environment. *Borough of Moosic v. Pennsylvania Public Utility Commission*, 59 Pa. Commw.Ct. 338, 429 A.2d 1237 (1981). This is not a factor for court evaluation of plaintiffs' NEPA claim. Furthermore, this court is mindful of the need to avoid deciding questions of state law particularly constitutional state law questions in the interests of comity. *See generally, United Mine Workers*, 383 U.S. at 726, 86 S.Ct. at 1139.

The proofs regarding the fifth claim concerning zoning and subdivision approvals are also substantially different than those involved under the NEPA claim. Zoning is traditionally a local and not federal concern and this court sees no need to hear the issue when plaintiffs have a convenient state forum in which to litigate the issue.

Given the differences in proof, considerations of comity, an available state forum in which plaintiffs may litigate these issues, the fact that additional briefing on the state issues would be needed since plaintiffs have focused almost exclusively upon the NEPA claim at trial and in their briefs, this court declines to exercise pendent jurisdiction over plaintiffs' fourth and fifth causes of action.

---

**13.** The Federal Rules of Civil Procedure cannot be used to expand the subject matter jurisdiction of the district courts. *Glus v. G.C. Murphy Co.*, 562 F.2d 880 (3d Cir.1977), remanded on other grounds, 451 U.S. 935, 101 S.Ct. 2013, 68 L.Ed.2d 321 (1981).